NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11920

EVENTMONITOR, INC. vs. ANTHONY LENESS.[1]


Suffolk.      November 3, 2015. - February 4, 2016.

Present: Gants, C.J., Spina, Cordy, Botsford, Duffly, & Lenk,
JJ.


Employment, Termination. Contract, Employment, Performance and
     breach, Termination, Indemnity. Indemnity. Massachusetts
     Wage Act. Damages, Employment contract.



     Civil action commenced in the Superior Court Department on
April 30, 2008.

     The case was heard by Jeffrey A. Locke, J.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Ronald W. Dunbar, Jr. (Andrew E. Goloboy with him) for the
plaintiff.
     Shana I. Kaplan (James E. O'Connell, Jr., with her) for the
defendant.
     David J. Fried, for Massachusetts Employment Lawyers
Association, amicus curiae, submitted a brief.

---

     [1] Before trial, Anthony Leness voluntarily dismissed all
claims against third-party defendant Sheldon Chang, who plays no
role in this appeal.

DUFFLY, J.   The plaintiff, EventMonitor, Inc. (EventMonitor), is a Delaware corporation, established in 2000, with headquarters in Boston.  It develops and markets software for the financial industry.  The defendant, Anthony Leness, was one of the early employees of the company.  Leness was hired as EventMonitor's vice-president for business affairs in June, 2001, upon his graduation from Harvard Business School.  He served in that position for approximately six years, until he was terminated on December 5, 2007, two months after he had proposed a plan to restructure EventMonitor into two related entities, a proposal that Sheldon Chang, EventMonitor's president and executive director, believed would undermine the future of the company.  The termination was characterized as "without cause."

Under the terms of Leness's employment contract, EventMonitor therefore was required to pay him one year's salary and benefits, plus the value of any accrued but unused vacation time.  Section 6(b) of the employment agreement provided that, upon termination, Leness was to return "all items containing or embodying Proprietary Information (including all copies)." Before his departure, Leness returned, among other things, a company laptop computer containing proprietary information that he had used in the course of his work at EventMonitor.

Soon after Leness's termination, through a forensic examination of the laptop computer, EventMonitor discovered that Leness had copied all of the data on the computer, including EventMonitor's customer information and proprietary business plans, to a data backup and storage service accessed over the Internet. Leness had not informed EventMonitor about this backup before his termination was effective. To the contrary, Leness had paid the subscription for the data storage service with a personal credit card, and also had installed a "cleaning" program in an effort (ultimately unsuccessful) to delete from the laptop information related to the account subscription. EventMonitor deemed Leness's actions to have been a defalcation of company assets. "Defalcation" was one of the only reasons in the employment contract that would have allowed EventMonitor to terminate Leness "for cause." And, where a termination was for cause, the contract did not require Eventmonitor to make any severance payments.

Retroactively characterizing the termination as having been for cause, in mid-February, 2008, approximately five weeks after Leness's departure, Eventmonitor stopped paying Leness any severance payments, declined to pay him his accrued vacation, and filed a complaint in the Superior Court asserting, among other claims, breach of contract. Leness asserted twelve

counterclaims, among them breach of contract; breach of the implied covenant of good faith and fair dealing; violations of the Massachusetts Wage Act, G. L. c. 149, § 148 (wage act); and indemnification under the terms of the employment contract.[2] Leness argued that EventMonitor had no valid basis for treating his termination as one "for cause," and had committed a breach of the contract by refusing to pay his severance payments, as well as violated the wage act by refusing to pay him the value of his accrued and unused vacation.

After a jury-waived trial, a Superior Court judge found that Leness had not engaged in defalcation of EventMonitor's assets, and had not committed a material breach of the employment contract, and thus that his termination could not have been for cause. Judgment entered for Leness on EventMonitor's claims for breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty. The judge also entered judgment for Leness on his counterclaims for breach of contract, breach of the covenant of

---

[2] EventMonitor, Inc. (EventMonitor), also filed claims for, inter alia, misrepresentation, declaratory judgment, unjust enrichment, and negligence. Leness also filed counterclaims alleging breach of fiduciary duty, self-dealing, intentional interference with advantageous relations, conflict of interest, defamation, a derivative shareholder claim, and a demand for access to company books and records. Prior to trial, the parties dismissed all but the four claims and corresponding counterclaims at issue on appeal.

good faith and fair dealing, and violations of the wage act, but entered judgment for EventMonitor on Leness's claim for indemnification.  EventMonitor appealed, and Leness cross-appealed.  We transferred the matter to this court on our own motion.

EventMonitor contends that the judge erred in finding that Leness did not commit a material breach of the employment contract and did not engage in a defalcation of company assets.  In support of its assertion that Leness's employment properly was terminated for cause, EventMonitor asks that we adopt the "after-acquired evidence doctrine" used in some other jurisdictions, which allows an employer to recharacterize the nature of an employee's termination on the basis of information learned after the termination has taken place.

In the rare opportunities that this court and the Appeals Court have had to consider the issue of after-acquired evidence in the context of a termination from employment, neither of the courts has adopted, or declined to adopt, this doctrine.  See Flesner v. Technical Communications Corp., 410 Mass. 805, 815-817 (1991); Prozinski v. Northeast Real Estate Servs., 59 Mass. App. Ct. 599, 610-612 (2004).  We need not reach the question here, because we agree with the trial judge that Leness did not commit a material breach of the employment contract, and did not

engage in defalcation of company assets.  Therefore, Leness committed no act giving rise to a termination for cause, and the after-acquired evidence doctrine would have had no impact on the result we reach.  We affirm the judge's conclusion that Leness is entitled to severance payments under the terms of the contract, and remand the matter for entry of an amended judgment correcting certain arithmetic errors in the calculation of accrued vacation payments.[3]

1.  Facts.  "We recite the essential facts found by the judge, which we accept 'unless they are clearly erroneous,' . . . and which the parties do not challenge, supplemented by other undisputed information from the record."  Boyle v. Zurich American Ins. Co., 472 Mass. 649, 651 (2015), quoting Weiler v. PortfolioScope, Inc., 469 Mass. 75, 81 (2014).

In June, 2001, EventMonitor hired Leness as vice-president for business affairs.  Leness and EventMonitor entered into a written employment agreement detailing how EventMonitor could terminate Leness with or without cause.  Termination without cause required thirty days' written notice; it also entitled Leness to severance payments consisting of twelve months of salary and benefits, unless he began full-time employment during

---

[3] We acknowledge the amicus brief submitted by the Massachusetts Employment Lawyers Association on behalf of Anthony Leness.

that period, and his accrued but unused vacation time.

Section 5 of the contract specified a very limited number of reasons that EventMonitor could terminate Leness's employment for cause, including if Leness "engaged in wilful fraud or defalcation, either of which involved funds or other assets of [EventMonitor]."

Section 6(b) of the employment agreement, the non-disclosure provision, required Leness to "hold in confidence and not knowingly disclose or, except within the scope of his employment, knowingly use any Proprietary Information." "Proprietary Information" was defined as:

> "[A]ll [i]nventions and all other business, technical and financial information (including without limitation, the identity of and information relating to customers, investors, vendors, business partners or employees of [EventMonitor]) . . . that relate to [EventMonitor] or the business or demonstrably anticipated business of [EventMonitor] or that are received by or for [EventMonitor] in confidence."

The section provided further that, upon termination of his employment, Leness was required "promptly [to] return to [EventMonitor] all items containing or embodying Proprietary Information (including all copies)."

Leness worked at EventMonitor for approximately six years. In the early years, the company grew substantially in terms of revenue and number of employees.  In the fall of 2007, however,

tensions developed between Leness and Chang over the direction of the company.  Those tensions escalated significantly after October 17, 2007, when Leness submitted a business proposal that would have left Chang to focus on research and development, using the existing software as a base product, and would have created a spin-off company for sales and support, with Leness in charge of that new entity.  The new entity would have taken the majority of EventMonitor's revenue, which was derived largely from service and licensing agreements with three large clients; in exchange, the new entity would have lent EventMonitor startup funds to develop several new products that were then being considered.

Chang initially agreed to Leness's suggestion that a new business plan be considered.  After seeing the proposal, however, Chang believed that the plan was developed to further Leness's self-interest, and the proposal demonstrated that he was not loyal to the company.  Consequently, in December, 2007, EventMonitor notified Leness of his termination.  On December 5, 2007, Chang informed Leness verbally that his employment was terminated "without cause," and sent him a copy of a written termination letter, via electronic mail, stating that EventMonitor was giving thirty days' notice.  As required by the employment contract, prior to the effective date of his

termination, Leness provided EventMonitor with information about client accounts and agreements, as well as a written explanation of the locations on the company computers where he had stored proprietary information.

After Leness's departure, Chang hired a forensic expert to examine Leness's work-issued laptop computer. The examination revealed that in early October, 2007, at approximately the same time that he submitted the proposal for restructuring EventMonitor, Leness paid for a one-year subscription to an on-line data storage service through a company called Carbonite. Carbonite is a professional data storage service that encrypts information for purposes of security. Using this subscription, Leness copied all of EventMonitor's files that had been on his laptop to Carbonite's data storage system. The uploaded data included EventMonitor's "proprietary information," as defined by the contract, including information related to its customers, business documents, and financing. Leness did not tell anyone at EventMonitor about the Carbonite account or the copying of EventMonitor's proprietary information to Carbonite's storage system.[4] Indeed, Leness used his personal electronic mail

---

[4] The judge found that Leness otherwise had "cooperated" with EventMonitor in his transition from the company, and had returned all company equipment, including a "complete set of his company files and data."

address, and his personal credit card, to pay for the Carbonite subscription.  Leness also downloaded a computer cleaning program to the company laptop in an effort to erase evidence of the Carbonite account from the laptop.

When Chang learned of Leness's actions in copying EventMonitor's proprietary information to the Carbonite system, he retroactively changed Leness's termination to one "for cause."  As a result, in early February, 2008, EventMonitor stopped making the severance payments required under the contract for a termination "without cause."  EventMonitor also refused to pay Leness for his unused vacation time, which, under the terms of the contract, it was required to pay regardless of the type of termination.  Ultimately, Leness informed EventMonitor that he would file a claim in the Superior Court if his severance payments were not resumed by May 1, 2008.  On April 30, 2008, without having made any further payments, EventMonitor commenced this action.

2.  <u>Material breach of the employment agreement</u>. EventMonitor argues that Leness committed a material breach of the employment agreement by violating section 6(b), which required him to maintain the confidentiality of EventMonitor's proprietary information and to return all such information, including all copies, upon termination.

A breach of a contract is a material breach when it involves "an essential and inducing feature of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 470 (1991), quoting Bucholz v. Green Bros., 272 Mass. 49, 52 (1930), S.C., 290 Mass. 350 (1935). Whether a party has committed a material breach ordinarily is a question of fact. See Cetrone v. Paul Livoli, Inc., 337 Mass. 607, 610 (1958); Coviello v. Richardson, 76 Mass. App. Ct. 603, 609 (2010); Prozinski v. Northeast Real Estate Servs., LLC, 59 Mass. App. Ct. at 609. See also 23 Williston on Contracts § 63:3 at 440 (4th ed. 2002). But if "the evidence on the point is either undisputed or sufficiently lopsided . . . the court must intervene and address what is ordinarily a factual question as a question of law." See Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 11 (1st Cir. 2006), quoting Gibson v. Cranston, 37 F.3d 731, 736 (1st Cir. 1994).

Thus, we accept a trial judge's findings as to the materiality of a breach unless they are clearly erroneous. Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996). "We are not bound, however, by the judge's conclusions of law, and we must ensure that the judge's ultimate findings and conclusions are consistent with relevant legal standards." Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 510

(1996).  See <u>Psy-Ed Corp</u>. v. <u>Klein</u>, 459 Mass. 697, 710 (2011), quoting <u>Kendall</u> v. <u>Selvaggio</u>, 413 Mass. 619, 620-621 (1992) ("In reviewing a judge's decision after a jury-waived trial, 'we . . . scrutinize without deference the legal standard which the judge applied to the facts'").  "If a judge's ultimate findings are inconsistent with the subsidiary findings, we must set them aside."  <u>Demoulas</u> v. <u>Demoulas Super Mkts., Inc</u>., <u>supra</u>. Here, the evidence fully supports the judge's findings, and there is no error in his determination, based on these findings, that Leness did not commit a material breach of the employment contract.

The judge found that in copying EventMonitor's proprietary information to Carbonite's data storage system, not disclosing the upload to EventMonitor, and not returning the Carbonite files upon his termination from employment, Leness violated section 6(n) of the employment contract, in particular because he did not return all copies of EventMonitor's proprietary information.  Nonetheless, as the judge correctly concluded, Leness's failure to return the information, while a "variance from complete compliance" with the employment contract, did not affect an essential and inducing feature of the contract, and therefore was not a material breach.

The judge found that there was no evidence that Leness had

used the information for any purpose, before or after his termination more than five years prior to the date of trial, or intentionally had disclosed it to anyone. The judge stated further that, while he did not credit Leness's stated reasons for having placed a copy of EventMonitor's proprietary information on the Carbonite system (EventMonitor's purportedly inadequate backup procedures), he also rejected EventMonitor's suggestion that the copying had been done with a malicious intent. Indeed, the judge stated that, given the circumstances and the state of the relationship between Leness and Chang in October, 2007, when the copies were made, Leness might well have wanted the copy in order to be able to demonstrate that he had not neglected his duties or acted deliberately to the detriment of EventMonitor's interests.

The judge concluded that the essential purpose of section 6(b) is to protect the confidentiality of EventMonitor's proprietary information. A breach of section 6(b) therefore becomes material if it undermines that confidentiality. Because there was no evidence or indication that Leness had disclosed EventMonitor's confidential information, Leness's breach was not material.

We observe that, while electronic copies of proprietary information placed on third-party storage devices potentially

could fall into the hands of competitors, or otherwise become public or be disclosed, as the judge found, there was no showing that such a result was likely to have, or had, occurred. Carbonite maintains its clients' information in a secure and encrypted manner, and its business model relies on its clients' confidence in this assurance. EventMonitor did not suggest, let alone offer evidence to prove, that its information could more readily be compromised because it temporarily had been stored on Carbonite's servers. Indeed, EventMonitor used similar data backup services, indicating that it did not view the use of such services as endangering the confidentiality of the information stored thereon.[5]

In any event, the possibility of unintentional disclosure is not relevant under the terms of the employment contract. As the judge found, Leness did not "knowingly disclose" or "knowingly use" any of EventMonitor's proprietary information. Accordingly, because Leness's breach did not endanger the confidentiality of EventMonitor's information, the breach was not material, and EventMonitor was not entitled to stop making severance payments. See Anthony's Pier Four, Inc. v. HBC

---

[5] We hasten to add that we make no determination regarding the level of security provided by Carbonite's systems, or the degree of risk that information a client stored there inadvertently might be disclosed to, or obtained by, a third party.

Assocs., 411 Mass. at 470; <u>Lease-It, Inc</u>. v. <u>Massachusetts Port Auth</u>., 33 Mass. App. Ct. 391, 396 (1992); 23 Williston on Contracts § 63:3 at 438.

3.  <u>Whether termination could be amended to one "for cause."</u>  Having concluded that Leness did not commit a material breach of the employment contract, we turn to EventMonitor's argument that Leness's breach nonetheless provided adequate grounds for EventMonitor to have converted the termination to one for cause.  To support its decision to change the termination to one "for cause," EventMonitor asks that we adopt the after-acquired evidence doctrine that has been accepted in some other jurisdictions.  This doctrine allows an employer retroactively to characterize a termination as one for cause if the employer shows that:  (1) an employee had committed misconduct; (2) the employer learned of the misconduct only after the employee's termination from employment; and (3) had the employer known of the misconduct prior to the termination without cause, the employer instead would have discharged the employee for cause on that basis of that conduct.[6]  See <u>McDill</u> v. <u>Environamics Corp</u>., 144 N.H. 635, 640-641 (2000) (citation

---

[6] The United States Supreme Court has prohibited application of the after-acquired evidence doctrine when a termination without cause has been found to have occurred for impermissible reasons, such as discrimination or retaliation.  See <u>McKennon</u> v. <u>Nashville Banner Pub. Co</u>., 513 U.S. 352, 359-360 (1995).

omitted).  As noted, supra, we need not address this argument, as we conclude that the information about Leness's activities about which EventMonitor learned subsequent to his termination without cause would not have supported a decision to terminate him for cause.

Under the terms of Leness's employment agreement, defalcation of company assets permitted a "termination for cause."[7]  EventMonitor argues that Leness's actions in uploading EventMonitor's proprietary information to the Carbonite data storage system constituted a defalcation of company assets, and that the judge erred in concluding that there was no defalcation.

The interpretation of the meaning of a term in a contract is a question of law, Eigerman v. Putnam Invs., Inc., 450 Mass. 281, 287 (2007), and thus we review the judge's determination de novo.  Trace Constr., Inc. v. Dana Barros Sports Complex, LLC, 459 Mass. 346, 351 (2011).  "When the words of a contract are clear they alone determine the meaning of the contract . . . ."  Merrimack Valley Nat'l Bank v. Baird, 372 Mass. 721, 723 (1977).

---

[7] The contract provided that Leness could be terminated for cause for "wilful fraud or defalcation."  Leness argues that he could only be terminated for cause under this provision if a defalcation was wilful.  The judge was not required to, and did not make, a finding as to willfulness, however, because he found that Leness had not engaged in any defalcation.

A reviewing court considers extrinsic evidence only when a term in a contract is ambiguous.  See Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 48 (1991).

Relying in part on a detailed examination of Massachusetts appellate decisions,[8] and the common meaning of the term "asset," the judge determined that "defalcation" within the meaning of the employment agreement did not include takings of nonmonetary assets.  The judge concluded also that, even if intangible assets had been subject to defalcation within the meaning of the contract, Leness's actions in uploading information to Carbonite did not deprive EventMonitor of the use or value of those assets, and that there was no evidence that he had disclosed, had intended to disclose, or had made use of the information for his own benefit or to the detriment of EventMonitor.

We agree that there was no defalcation here.  Regardless of whether defalcation under Massachusetts law is limited solely to the taking of funds, in ordinary usage defalcation requires at least a temporary misuse or deprivation of the use or value of an asset,[9] and the employment agreement does not otherwise define

_____

[8] Although EventMonitor is a Delaware corporation, its officers are in Boston, and the employment agreement specified that it was to be interpreted in accordance with Massachusetts law.

[9] See Black's Law Dictionary 506 (10th ed. 2014) (defining

the term.

The judge found, and the finding is supported by the evidence, that Leness did not misuse or deprive EventMonitor of its proprietary information.  Leness merely retained a copy of the information under circumstances that had no impact on EventMonitor's use of its proprietary information, or on the value of that information.  If Leness had disclosed or used the information, his actions might have allowed a competitor to offer a similar product without substantial development costs, reduced the standing of the company in the eyes of its clients, or provided a competitor with information about EventMonitor's customers, any one of which possibly could have resulted in a

defalcation as "fraudulent misappropriation of money held in trust; financial wrongdoing involving a breach of trust; embezzlement"); The American Heritage Dictionary of the English Language 488 (3rd ed. 1992) (defining "defalcate" as to "misuse funds; embezzle").

Although no Massachusetts case has defined the term "defalcation" explicitly, where the term appears, it is used in accordance with its ordinary and plain meaning, that is, a misuse or deprivation of the use of an asset held in trust. See, e.g., Indeck v. Clients' Sec. Bd., 450 Mass. 379, 380-381 (2008) ("defalcation" describes conduct of attorney who misappropriated client funds entrusted for investment); Buster v. George W. Moore, Inc., 438 Mass. 635, 652 (2003) ("defalcation" used to describe act of misappropriating entrusted property, depriving property owner of its use); Matter of Driscoll, 410 Mass. 695, 704 (1991) (Greaney, J., dissenting) ("defalcation" used to describe conduct of attorney who used client funds to pay personal debts); Mickelson v. Barnet, 390 Mass. 786, 790 (1984) ("defalcation" used to describe accountant's embezzlement of investors' funds).

loss of revenue. Such loss did not occur here. We need not decide whether actions that result in a loss of the exclusive use of proprietary information could have amounted to a "defalcation" within the meaning of the contract, because Leness's secure storage of a copy of the proprietary information, in the absence of any disclosure or use by anyone other than EventMonitor, did not undermine EventMonitor's exclusive use of its information.

4. Indemnification. Leness argues that the judge erred in concluding that EventMonitor was not required to indemnify him for his costs incurred in defending against EventMonitor's claims. Leness's argument that he is entitled to indemnification is not supported by the plain language of the contract. The employment agreement's indemnity clause, section 10(h), states that EventMonitor must indemnify Leness if he

> "is made a party . . . to any . . . action, suit or proceeding . . . by reason of the fact that [Leness] is or was an employee, officer or director of [EventMonitor] . . . in which capacity [Leness] is or was serving at [EventMonitor's] request."

Thus, under its plain language, the clause requires indemnification only if a claim is brought against Leness as a result of actions in his capacity as an employee, acting at EventMonitor's request. Here, Leness was made a party to an

action only after EventMonitor discovered that he had uploaded its proprietary information to a third-party data storage service.  As the trial judge found, the filing of the lawsuit was a direct result of Leness's actions with respect to the Carbonite data storage subscription, undertaken in his personal capacity and not in his capacity as EventMonitor's employee.

These findings are well supported in the record and are not clearly erroneous.  Leness's conduct in purchasing the subscription using a personal credit card and personal electronic mail account, uploading the information without advising anyone at EventMonitor of his actions or his purported reason for doing so (EventMonitor's supposedly inadequate backup procedures),[10] and then attempting to erase all traces of the Carbonite subscription from his computer, supports the inference that use of the Carbonite data storage service was undertaken in Leness's personal capacity, rather than as an employee.  Leness also committed a breach of the employment contract by not returning or deleting the copy of EventMonitor's proprietary information stored on the Carbonite system before his employment ended.  EventMonitor was not required to indemnify Leness for

---

[10] As noted, the judge rejected as not credible Leness's explanation that he used Carbonite because he was worried about the stability of EventMonitor's internal backup procedures, but concluded that the copying was not with malicious intent.

defending against a lawsuit resulting from actions that were not undertaken in his capacity as an employee.

    5.  <u>Calculation of damages for violations of the wage act</u>. General Laws c. 149, § 148, requires timely payment of wages, including payments due under the terms of an agreement for accrued but unused vacation time.  The judge determined that Leness was entitled to payment for 8.4 days of accrued and unused vacation.[11]  Neither party disputes the judge's calculation of the number of days at issue.  In his brief, however, Leness contends that the judge's calculation of damages for those days, in the amount of $4,732.10, trebled to $14,196.30 (as required by G. L. c. 149, § 150), is erroneous due to a mathematical error.  We agree that based on a daily rate of $673.08, the damages for 8.4 days of accrued vacation pay should have been $5,653.87, trebled to $16,961.62.[12]

---

    [11] The contract entitled Leness to fifteen vacation days per year, and to accrue unused vacation days.

    [12] The judge stated that he derived the amount of damages by multiplying Leness's daily rate by 8.4 days, then trebling that amount.  The result he reached in the initial multiplication ($4,732.10), however, is mathematically incorrect.  Dividing Leness's weekly rate of $3,365.38 by five results in a daily rate of $673.08.  Thus, the damages for 8.4 days at a rate of $673.08 per day should have been $5,653.87.  That the judge calculated a daily rate based on a five-day work week is evident from his finding that, in addition to his annual salary, Leness was entitled to severance pay of $10,096.15 for fifteen days of vacation benefits ($10,096.15 divided by fifteen equals

According to the Superior Court docket sheet, although, in 2012, Leness's motion pursuant to Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974), to amend the judgment in order to add costs was allowed, Leness has not filed in the Superior Court a motion for relief from judgment for a clerical mistake, pursuant to Mass. R. Civ. P. 60 (a), 365 Mass. 828 (1974) or mistake or inadvertence pursuant to Mass. R. Civ. P. 60 (b). Nonetheless, modification of a judgment to correct an inadvertent error of this type, in a mathematical calculation, is appropriately raised on appeal. See Massachusetts Mun. Wholesale Elec. Co. v. Springfield, 49 Mass. App. Ct. 108, 113-114 (2000). Leness is entitled to entry of an amended judgment to correct the mathematical miscalculation.

6. Conclusion. The judgment is affirmed as to all claims and counterclaims other than the amount of damages awarded to the plaintiff-in-counterclaim under G. L. c. 149, § 148, of the wage act. The matter is remanded to the Superior Court for entry of an amended award of damages on the wage act claim, consistent with this opinion.

So ordered.

---

$673.08).