NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12397

G4S TECHNOLOGY LLC  vs.  MASSACHUSETTS
TECHNOLOGY PARK CORPORATION.


Suffolk.     March 5, 2018. - June 13, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.



Contract, Public works, Construction contract, Performance and
     breach, Subcontractor, Damages.  Public Works, Delay, Extra
     work.  Damages, Breach of contract, Quantum meruit, Fraud.
     Practice, Civil, Summary judgment, Damages.  Fraud.




     Civil action commenced in the Superior Court Department on
September 22, 2014.

     The case was heard by Janet L. Sanders, J., on motions for
summary judgment, and entry of separate and final judgment was
ordered by her.

     The Supreme Judicial Court granted an application for
direct appellate review.


     Christopher Weld, Jr. (Megan C. Deluhery & Joel Lewin also
present) for the plaintiff.
     Robert J. Kaler (Edwin L. Hall also present) for the
defendant.
     Carol Chandler, Brendan Carter, David E. Wilson, Shannon A.
Reilly, & Mark Keough Molloy, for Associated Builders and
Contractors, Massachusetts Chapter, & others, amici curiae,
submitted a brief.

Maura Healey, Attorney General, & James A. Sweeney & Cassandra H. Arriaza, Assistant Attorneys General, for the Attorney General, amicus curiae, submitted a brief.

KAFKER, J.  At issue is a construction contract dispute between G4S Technology LLC (G4S) and Massachusetts Technology Park Corporation (MTPC) arising out of a State- and federally funded project to design and build a fiber optic network in western and north central Massachusetts.  On summary judgment, a judge in the Superior Court concluded that G4S was barred from seeking recovery on the contract or under quantum meruit because it intentionally filed false certifications of timely payments to subcontractors.  The judge also concluded that MTPC could not maintain a fraud action against G4S, in which it sought damages in addition to the $4 million payment MTPC already had withheld from G4S, because any recovery would be duplicative.

On appeal, G4S argues that MTPC was not damaged by the false certifications, and that the Commonwealth should replace the common-law rule that "in relation to building contracts, . . . a contractor cannot recover on the contract itself without showing complete and strict performance of all its terms," Andre v. Maguire, 305 Mass. 515, 516 (1940), with a materiality rule as provided in the Restatement (Second) of Contracts §§ 237, 241 (1981).  Alternatively, G4S contends that, even if recovery on the contract is disallowed, it should be able to pursue an

equitable recovery under the doctrine of quantum meruit. G4S argues that MTPC, and not G4S, was responsible for the delays in construction and the $10 million in increased costs G4S assumed. MTPC cross-appealed from the dismissal of its claim of fraud against G4S.

We conclude that complete and strict performance is still required for all construction contract terms relating to the design and construction itself. We also conclude, however, that ordinary contract principles, including the traditional Massachusetts materiality rule, apply for breaches of other provisions, such as the one at issue governing payment certifications. We hold that G4S's numerous false certifications and intentional subcontractor payment delays constitute a material breach of the contract and, standing alone, preclude recovery for breach of contract.

Summary judgment was not, however, properly granted on G4S's quantum meruit theory of recovery. A party seeking to recover under quantum meruit must prove both substantial performance and good faith. Substantial performance is not at issue here, as the project was completed as specified, albeit delayed. The issue is whether a party that has intentionally committed a breach of a provision in the contract can still have acted in good faith for quantum meruit purposes and whether there has been a windfall for the other party. Overruling an

older line of cases, we now hold that good faith applies to the contract as a whole, and that the intentional commission of breaches of individual contract provisions must be considered in the over-all context, including the value of the uncompensated work, the damage caused by the breach, the total performance of both parties, and the balancing of equities to accomplish a just result. Here, there are material disputed facts regarding which party caused the delays, whether G4S performed $10 million of uncompensated work, and whether there is any causal connection between the intentional misrepresentations regarding payments to subcontractors and the damages assessed against G4S. We thus reverse the award of summary judgment on the quantum meruit claim for further fact finding.

We further conclude that the dismissal of MTPC's fraud claim against G4S was error. The undisputed facts establish fraudulent certifications. The motion judge dismissed the count as duplicative, concluding that the fraudulent certifications provided the basis for damages under all the different claims presented and recovery under the fraud claim would be far less than the amount MTPC was allowed to retain for breach of contract. Where separate recoveries are based on the same act and injury, duplicative recovery is precluded. Here, however, further fact finding is required to discern whether there could be factually separable and distinguishable acts resulting in

separable quantifiable injuries.  We therefore reverse the allowance of summary judgment on the fraud claim.[1]

1.  Background.  MTPC is a State development agency created and organized under G. L. c. 40J.  In 2010, MTPC received funding from both the Commonwealth and the Federal government to build a 1,200-mile fiber optic network connecting 123 communities in western and north central Massachusetts to high-speed Internet (project).  An approximately $89.7 million construction project, it connects "[o]ver 1,100+ public safety entities, schools, libraries, medical facilities, and town halls[,] . . . serve[s] as a backbone for over 400,000 households and businesses over a geographic area covering over one-third of Massachusetts, with more than one million residents[,] . . . [and] [p]rovides necessary broadband infrastructure to foster economic growth, improve health care and education, and strengthen public safety."  Of the $89.7 million project, $45.4 million was funded by the American Recovery and Reinvestment Act of 2009, 111th Cong., Pub. L. No. 111-5, 123 Stat. 115 (2009) (Recovery Act).  In the wake of the "Great Recession," the funds were to be used "in a manner that

---

[1] We acknowledge the amicus briefs submitted by Associated Builders and Contractors, Massachusetts Chapter; Associated General Contractors of Massachusetts; Associated Subcontractors of Massachusetts, Inc.; Construction Industries of Massachusetts, Inc.; and Utility Contractors' Association of New England, Inc.; and by the Attorney General.

maximize[d] job creation and economic benefit" and was intended to "provide a one-time injection of funds for the purpose of stimulating the American economy."

Time was of the essence with respect to the dates for substantial completion and final completion of the project.[2] According to the initial procurement documents, the Recovery Act award placed "significant time constraints on the construction of the Project."  The design-builder thus was contractually

---

[2] The contract provided that "substantial completion" was

"the date on which either (a) the Work required by the Contract Documents has been completed except for Work having a Contract Price of less than one per cent (1%) of the then adjusted total Contract Price, or (b) the Network, or an agreed upon segment of the Network, is sufficiently complete and connected to the Internet that Owner can use it for its intended purposes except for minor incomplete or unsatisfactory Work items that do not materially impair the usefulness of the Work required by the Contract Documents. To meet these conditions, all fiber optic cable and all equipment must have been installed and tested successfully and passed pre- and post-construction testing and ready to begin the conditional Network acceptance testing period, and all operating manuals, warranties, and as-built documents pertaining to that portion of the Work have been delivered to the Owner."

"Final Completion" was

"the date on which the Network, and all equipment and fiber supplied by or made available to the Design-Builder for installation in the Network, all Work is successfully completed, has been handed over to and accepted by Owner, no Work items required by the Contract Documents remain incomplete or unsatisfactory, and Owner has received and accepted all documentation and Project close-out deliverables required under the Contract Documents."

obligated to meet mandatory milestones:  complete fifty-five per cent of the value of the work by June 30, 2012; achieve substantial completion by April 15, 2013; and achieve final completion by June 30, 2013.

MTPC put the project out to public bid, and a design-build contract with G4S was executed on June 30, 2011.  After adjustments, the total contract value was $45.5 million.  G4S agreed to the mandatory milestones and acknowledged that if "any Date for a Mandatory Milestone, after adjustment for any extensions of time . . . is not attained as a result of any failure of [G4S] to perform, then [G4S] shall pay [MTPC], as part of compensatory delay damages . . . for each Day . . . that achievement of the Mandatory Milestone" is not met as damages are "difficult to determine and specify accurately."[3]

Damages for failure to attain substantial completion by April 15, 2013, was $7,500 per day and escalated to $9,500 per day after June 30, 2013.  Failure to attain final completion by June 30, 2013, was $3,000 per day; daily rates additive for any periods of overlap.  The contract, however, also contemplated a remedy should there be excused delays to the project.  Articles 8.2.1 and 8.2.2 provided that, "[i]f [G4S] is delayed in the

---

[3] The contract provided that "[t]he compensatory delay damages . . . shall be [MTPC's] sole remedy for any failure of [G4S] to meet the above dates."

performance of the Work due to acts, omissions, conditions, events, or circumstances beyond its control and due to no fault of its own, . . . the Contract Time(s) for performance shall be reasonably extended by Change Order . . . [and G4S] shall also be entitled to an appropriate adjustment of the Contract Price."

MTPC's contract with G4S set forth additional provisions, at issue here. They included (1) procedures for obtaining a change order to adjust the contract price and time in the event of delay to the work; (2) MTPC's right to stop and suspend the work and terminate G4S for cause should G4S, among other reasons, fail to "timely pay, without cause . . . subcontractors"; (3) MTPC's obligation to facilitate timely and efficient performance of the work, submit conduit and pole attachment applications for licenses and leases, and perform any "Make-Ready work" necessary to permit G4S to perform its construction and installation work; and (4) G4S's right to, within ten working days of awareness of excused work delay, request an equitable adjustment to the contract price or an equitable extension of time for the reasonable costs of excused delays or differing site conditions.

Following the June 30, 2011, execution of the design-build contract and the subsequent notice to proceed, G4S commenced the work. On September 21, 2012, MTPC notified G4S of nonconforming

work and requested corrective action.[4]  On December 10, 2012, MTPC notified G4S a second time of nonconforming work and gave notice that G4S had failed to cure the prior nonconforming work.[5] At various times, change orders were executed throughout the performance of the work.  The dates to achieve substantial and final completion of the project were adjusted to July 31, 2013, and October 31, 2013, respectively.  The parties reserved their respective rights, stating that "[n]othing in . . . Change Order[s] shall be taken as a waiver of any rights or defense of [MTPC] and [G4S] with respect to any other request for change, equitable adjustment or other claim."

On March 7, 2014, over seven months past the contractual substantial completion date, substantial completion of the

---

[4] Among other things, the notice of nonconforming work that Massachusetts Technology Park Corporation (MTPC) sent to G4S Technology LLC (G4S) alleged that G4S had been performing work with insufficiently skilled labor, resulting in poor workmanship; that G4S failed to follow industry standards with the installation of certain project parts; and that G4S's work generally suffered from a lack of planning, poor leadership, and poor quality.  The notice acknowledges that G4S had made improvements over time, but it stated that more corrective action on behalf of G4S was needed.  The notice requested a conference between G4S and MTPC as well as a plan of action to resolve the issues.

[5] MTPC sent G4S a second notice.  This notice alleged that G4S failed to take corrective action in accordance with the plan laid out by the parties following the first notice.  The notice also restated several of the issues MTPC had with G4S, including a general lack of planning, poor performance, and poor leadership.

network was achieved.  On March 21, 2014, G4S submitted a request for equitable adjustment (REA) seeking additional compensation and an extension of time for the dates of substantial completion and final completion.  On April 1, 2014, MTPC responded to G4S's REA and asserted that G4S was not entitled to additional time or money and that G4S was the reason for the delay.[6]  On August 15, 2014, MTPC issued a "Notice of Withholding" to G4S claiming damages in the amount of approximately $4 million resulting from the delays and failure to perform required tasks.[7]

On September 10, 2014, G4S submitted an amended REA to MTPC for approximately $10 million.  G4S asserted that, because of MTPC's "failure to timely complete the necessary predecessor Make-Ready work," G4S incurred substantial additional time and

---

[6] Neither G4S's March 21, 2014, request for equitable adjustment nor MTPC's April 1, 2014, letter was in the submitted record.

[7] In accordance with the August 15, 2014, notice of withholding, MTPC withheld approximately $2 million, based on the liquidated damage rate of $9,500 per day for 219 days, on account of G4S's failure to achieve substantial completion of the project by July 31, 2013, the date established for substantial completion.  Additionally, MTPC withheld $864,000, based on the liquidated damages rate of $3,000 per day for 288 days, on account of G4S's failure to achieve final completion by October 31, 2013, the date established for final completion. Lastly, MTPC withheld the additional sum of approximately $1.3 million for reimbursements due and extra cost and expenses incurred on account of G4S's failure to perform or complete required tasks.

costs in completing the project. It explained, "The failure of [MTPC] to timely complete the predecessor activities to G4S installation work resulted in the work often being performed with different crew configurations, out-of-sequence, in smaller non-contiguous distances, utilizing premium time/extended work days, and often in different climatic conditions than what was contemplated under the baseline schedule." The amended REA referenced provisions in the contract that permitted G4S to recover increased costs due to circumstances that were no fault of the design-builder. G4S also stated that it had filed the necessary change orders required by article 8.2.1 and that the parties had reserved their rights regarding those change orders.[8] Contending that MTPC's failure was thus the "root cause of delays and impacts to the Project," G4S also requested another adjustment to the dates to achieve substantial and final completion of the project. The response, if any, to the REA, is not in the submitted record.

On January 20, 2015, MTPC issued a Certificate of Final Completion of the Work, over one year after the contractual final completion date. On February 11, 2015, MTPC issued a recalculated and updated "Notice of Withholding" of approximately $4 million, to account for subsequent delays,

---

[7] The change orders referenced in G4S's amended REA were not in the submitted record.

costs, and expenses.

G4S brought an action in the Superior Court against MTPC for breach of contract, breach of warranty, and quantum meruit. G4S asserted that MTPC's withholding of $4 million was improper and contended that MTPC wrongfully denied its $10 million REA. MTPC, in turn, brought counterclaims against G4S alleging fraud and violations of G. L. c. 93A. By the start of litigation, MTPC had paid G4S approximately $41 million of the original $45 million total contract value.

During discovery, evidence revealed that, unbeknownst to MTPC, G4S engaged in a pattern of submitting inaccurate "progress payment releases" (certifications) when sending its applications for payment.[9] As previously explained, the contract expressly stated that subcontractors were to be paid on time and that a failure to do so, without cause, was grounds for terminating the contract with G4S. G4S certified to MTPC that it had timely paid its subcontractors, but this was not true.

---

[9] Through the "progress payment releases" (certifications), G4S represented and warranted that

> "all subcontractors, suppliers and equipment providers of the undersigned have been paid in full all amounts due to them up to the date of this Certification, and that the sums received in payment for the Amount Requested shall be used to forthwith pay in full all amounts due to such subcontractors, suppliers and equipment providers up to the date hereof."

Spanning more than one year, G4S, a publicly traded company, repeatedly and continuously delayed payments to its subcontractors until after its fiscal quarters closed, so it could show a more favorable cash flow in its quarterly reports.[10]

In sum, G4S received $38.6 million in progress payments through sixty false certifications. The work had been performed, but the subcontractors had not been paid prior to the certifications.

The delayed payments did not go unnoticed by the subcontractors. At various times, subcontractors strongly objected and threatened to shut down work or remove crews from the project if G4S continued to withhold payments, even as G4S was getting paid by MTPC.[11] Despite such protests, there was no

_____

[10] G4S's contract manager, who was responsible for paying subcontractors, acknowledged in contemporaneous electronic mail (e-mail) messages as well as in her later deposition that there remained past due invoices for significant sums that were outstanding at the time the certifications were executed. The certifications were nevertheless submitted to MTPC. One internal e-mail message from a G4S project manager criticized this practice stating, "How can we tell sub[contractors] that they aren't getting paid so our books look better? There's something wrong with that."

[11] For example, in an e-mail message to G4S, one subcontractor wrote, "I think it is extremely unfair that you are not honoring our contract. . . . The issue that bothers me the most is that you are not making payment [in order] to better your books but don't care about the books of the companies that support you." Another subcontractor wrote to G4S that they were owed $358,275, which presented a "significant problem" for the subcontractor as it sought to pay its work crews.

indication from the submitted record that any of the subcontractors demanded direct payment of balances due from MTPC, as was the subcontractors' statutory right under G. L. c. 30, § 39F,[12] nor did they shut down work or remove crews.

MTPC moved for summary judgment, and in March, 2016, the judge granted summary judgment to MTPC as to G4S's complaint. The judge concluded that G4S intentionally committed a breach of the contract and thus, without complete and strict performance of all of the contract's terms, could not recover on the contract. The judge, relying on an older line of cases that we overrule today, also concluded that G4S could not recover under a theory of quantum meruit because an intentional violation of a contract provision was inconsistent with a finding of good faith and barred all such recovery unless the violation was deemed "so trifling as to fall within the rule de minimis." See Andre, 305 Mass. at 516. G4S's payment delays and false certifications were inconsistent with the good faith requirement. In January, 2017, in a subsequent decision, the judge dismissed MTPC's counterclaims of fraud and G. L. c. 93A. The judge reasoned

---

[12] General Laws c. 30, § 39F (d), provides: "If, within seventy days after the subcontractor has substantially completed the subcontract work, the subcontractor has not received from the general contractor the balance due under the subcontract . . . , the subcontractor may demand direct payment of that balance from the awarding authority."

that permitting additional compensation to MTPC under a theory of fraud would be improperly duplicative because the underlying conduct forming the basis of MTPC's fraud claim was the same as the contract claim.  The judge also noted that MTPC, as a public entity acting pursuant to a legislative mandate, was not acting in a business context and therefore was not engaged in trade or commerce for the purposes of G. L. c. 93A.  G4S appealed from the Superior Court decision, and we granted its application for direct appellate review.

2.  Discussion.  "Our review of a motion judge's decision on summary judgment is de novo, because we examine the same record and decide the same questions of law." Kiribati Seafood Co. v. Dechert LLP, 478 Mass. 111, 116 (2017).  "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law" (citation omitted). Casseus v. Eastern Bus Co., 478 Mass. 786, 792 (2018).  Here, we affirm the decision to grant summary judgment on the contract claim, but conclude that there are material disputed facts precluding summary judgment on the quantum meruit and fraud claims.

a.  Complete and strict performance of all construction contract terms.  "The law has long been settled in this

Commonwealth, in relation to building contracts, that a contractor cannot recover on the contract itself without showing complete and strict performance of all its terms . . . ." Andre, 305 Mass. at 516. See Peabody N.E., Inc. v. Marshfield, 426 Mass. 436, 441 (1998); United States Steel v. M. DeMatteo Constr. Co., 315 F.3d 43, 50 (1st Cir. 2002). G4S claims that the complete and strict performance requirement is outdated and asks us to adopt instead the "materiality rule" set forth in Restatement (Second) of Contracts, supra at §§ 237, 241.[13] We

---

[13] Restatement (Second) of Contracts § 237 (1981) provides: "[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."

Section 241 presents five factors to consider whether a failure is material:

"In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

"(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

"(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

"(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

"(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

decline this invitation.  We do, however, interpret the complete and strict performance requirements in construction contracts as being limited to the design and construction itself, as explained infra.  All of our previous holdings imposing complete and strict performance have concerned breaches of the actual design and construction of the project.

Our construction law cases have emphasized the importance and need for strict compliance with construction law contracts to ensure that the construction itself is done safely and correctly according to design specifications.  See, e.g., Russo v. Charles I. Hosmer, Inc., 312 Mass. 231, 233-234 (1942) (failure to follow design requirements in guard rails posed public safety problems).  This is particularly true as defects are difficult to identify and expensive to fix in a finished project.  See id. at 233 (deviation from number of steel rods cast in concrete to provide support for highway guard rail unknown to owner); Bowen v. Kimbell, 203 Mass. 364, 368 (1909) (cost to cure deviation from building specification after building's construction disproportionately high).  Thus, we have not tolerated any breaches that relate to whether the

--------

"(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

construction was completed according to design specifications. See <u>Peabody N.E., Inc</u>., 426 Mass. at 437, 441 (failure to substantially complete construction of septage and grease waste facility by terms of agreement not complete and strict performance); <u>J.A. Sullivan Corp</u>. v. <u>Commonwealth</u>, 397 Mass. 789, 790 (1986) (failure to complete itemized list of finish work, corrections, repairs, and services for construction of public college building not complete and strict performance); <u>Albre Marble & Tile Co</u>. v. <u>Governman</u>, 353 Mass. 546, 549-550 (1968) (failure to ensure satisfactory surfaces before tile installation not complete and strict performance); <u>Russo</u>, <u>supra</u> (failure to install highway guard rail in accordance with terms specifying number of steel rods not complete and strict performance); <u>Andre</u>, 305 Mass. at 516-517 (failure to comply with plans and specifications of house construction not complete and strict performance); <u>Bowen</u>, <u>supra</u> (failure to use correct ratio as provided in specifications for making plaster not complete and strict performance); <u>Hayward</u> v. <u>Leonard</u>, 7 Pick. 181, 185 (1828) (failure to build house to specifications not complete and strict performance).

In the instant case, design and construction provisions that would require strict and complete performance would include, for example, the following:

"The fiber optic cable and infrastructure system shall be

designed and installed for a minimum life expectancy of 30 years[.]"

"All fiber strands and buffer tubes shall be color coded with highly distinguishable, vibrant colors[.]"

"The fiber cable shall have a circular cross section so that aerial installation can be done with standard sheaves and tensioning equipment[.]"

"The . . .Fiber Optic Network will consist of a core fiber backbone with extensions to two (2) major . . . regional network centers located at One Summer Street in Boston, MA and One Federal Street in Springfield, MA."

We recognize, however, that construction contracts can be thousands of pages long, containing all types of different provisions.[14] We have not considered in our cases the consequences of breaches of construction contract provisions that are subsidiary to or supportive of the design and construction, but do not directly involve the design and construction itself. We clarify today that the complete and

---

[14] Here, the 1,400-page contract between MTPC and G4S provided many provisions unrelated to the actual construction work. Examples of such provisions include (1) G4S was to submit printed copies of required manuals in "heavy-duty, commercial-quality, durable, 3-ring, vinyl covered, loose-leaf binders, in thickness necessary to accommodate contents, sized to receive 8-1/2" by 11" paper. The binder spine shall provide a clear plastic sleeve to hold labels identifying the contents"; (2) G4S was to ensure that the Recovery and Reinvestment Act of 2009 logo emblem was at least six inches or larger in diameter and ensure clear space surrounding the logo equal to one-half of the logo's radius; and (3) G4S was required to provide, for MTPC field inspectors, offices with a "minimum of 200 square feet of usable space with . . . a [d]esk, desk chair, visitor chair and plan table[,] . . . [p]ortable radio with contractor frequencies and charger[,] . . . [and] [w]eekly office cleaning services."

strict performance requirements in construction contracts apply only to the design and construction work itself. Other provisions should be analyzed pursuant to ordinary contract principles, including the materiality standard applied under Massachusetts contract law. See EventMonitor, Inc. v. Leness, 473 Mass. 540, 546 (2016), quoting Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 470 (1991); Buchholz v. Green Bros., 272 Mass. 49, 52 (1930), S.C., 290 Mass. 350 (1935).[15]

The question then becomes what is the legal status of the contractual violations here. The construction contract at issue was to "design, furnish, build and equip a complete fiber optic network system . . . for a fully implemented, functional and tested system" in accordance with the project construction schedule. The "Work" was defined broadly as comprising

> "all Design-Builder's design, construction and other
> services required by the Contract Documents, including
> procuring and furnishing all materials, equipment, services
> and labor specified by or reasonably inferable from the
> Contract Documents, to develop, install, and test the
> Network, and including the submission and delivery of all
> documents and other things as required or reasonably
> inferable from the Contract Documents."

The contractual violations at issue did not concern the actual

---

[15] We decline to adopt the materiality standard of the Restatement (Second) as argued by G4S. We recognize, however, that many of the different elements of the Restatement materiality standard are considered in either our contract or our quantum meruit analysis.

design and construction of the project.  Instead, they were about the timing of payments to subcontractors and the documentation concerning those payments.[16]  G4S delayed payments and filed false certifications to allow it, a public company, to report inflated revenues for its quarterly reports.  We thus analyze these violations under a materiality standard, not complete and strict performance.

In the Commonwealth, a material breach of a contract occurs when the breach concerns an "essential and inducing feature of the contract."  See EventMonitor, Inc., 473 Mass. at 546, quoting Anthony's Pier Four, Inc., 411 Mass. at 470.  Essential and inducing features of a contract are provisions that are "so serious and so intimately connected with the substance of the contract[]" that a failure to uphold the provision would justify

---

[16] Contract terms defining payment or reporting requirements may have an impact on construction but they are not design and construction contract terms analyzed pursuant to the complete and strict performance requirement.  Rather they are analyzed according to the materiality standard.  For example, payment delays or disputes may cause subcontractors to stop or slow down work by temporarily pulling crews or reducing the number of workers.  That would result in delays in the construction, but even delays in the construction are different from the design and construction itself.  If, however a subcontractor, having not received timely payments, installs an insufficient amount of highway guard rails, uses plastering of inferior quality, or does not complete the project, such breaches would be analyzed under complete and strict performance.  See Peabody N.E., Inc. v. Marshfield, 426 Mass. 436, 441 (1998); Russo v. Charles I. Hosmer, Inc., 312 Mass. 231, 233-234 (1942); Bowen v. Kimbell, 203 Mass. 364, 368 (1909).

the other party walking away from the contract and no longer being bound by it. See Buchholz, 272 Mass. at 52 (failure to make monthly payments as agreed to in contract material breach because payments "essential and inducing feature").

There can be little doubt that paying subcontractors on time was an essential and inducing feature of the contract between MTPC and G4S. See Buchholz, 272 Mass. at 52 (in contract to paint and maintain signs, payment of wage "essential and inducing feature"). The "[p]rompt payment of subcontractors on public works is a consistent legislative purpose." Manganaro Drywall, Inc. v. White Constr. Co., 372 Mass. 661, 664 (1977). This is particularly true here, where a significant portion of the project funding came from the Recovery Act, the purpose of which was to "maximize[] job creation and economic benefit" and "provide a one-time injection of funds for the purpose of stimulating the American economy."

The contract itself also stressed the importance of timely payments to subcontractors. As provided in article 10.2 of the contract's general conditions, MTPC could walk away from the contract and no longer be bound by its terms if G4S failed to timely pay subcontractors. G4S's repeated instances of intentionally failing to timely pay subcontractors in accordance with the agreed-upon contract was therefore a material breach of the contract, barring G4S from recovering breach of contract

damages.  See Buchholz, 272 Mass. at 55.[17]

G4S not only delayed the payments but also falsely certified that it had made the payments, thereby magnifying and multiplying the number of material breaches.  The contract here independently required proper certification of payments.  Those provisions were intentionally violated.  Intentional misrepresentations to the government for financial gain are significant breaches of contract in and of themselves and can be serious civil and criminal offenses.[18]  In the words of Justice Holmes, contractors "must turn square corners when they deal with the Government."  Rock Island, Ark. & Louisiana R.R. v. United States, 254 U.S. 141, 143 (1920).  G4S did the opposite, cutting those corners for improper purposes.  In sum, the delayed payments and the false certifications here were material

---

[17] G4S argues that the subcontractors were eventually paid and thus the breach was cured.  Given the importance of timely payment, we do not consider the delayed payments a cure for the contractual violation.  They do, however, have an impact on the equities and the quantum meruit analysis.

[18] We note that persons or corporations who make a fraudulent claim for payment to a State government entity are subject to civil penalties under the Massachusetts False Claims Act, G. L. c. 12, §§ 5A-5O.  When any funding for a public contract is provided by the Federal government, civil and criminal sanctions may also be pursued under the civil or criminal False Claims Act.  See 31 U.S.C. §§ 3729-3733 (civil); 18 U.S.C. § 287 (1986) (criminal).  Additionally, the Division of Capital Asset Management and Maintenance may suspend or debar persons who wilfully supply materially false information while performing a public contract.  G. L. c. 29, § 29F.

breaches of the contract precluding recovery on G4S's contract claim.

b. Recovery under quantum meruit. G4S contends that even if it is not entitled to pursue its contract claim, it should be allowed to recover under a quantum meruit theory. We conclude that there are genuine issues of material fact in dispute on the quantum meruit claim. To recover under quantum meruit in a construction case, a contractor must prove both substantial performance of the contract and an endeavor in good faith to perform the work fully. J.A. Sullivan Corp., 397 Mass. at 796; Albre Marble & Tile Co., 353 Mass. at 550; Andre, 305 Mass. at 516. "The underlying basis for [recovery under quantum meruit] is derived from principles of equity and fairness, to prevent unjust enrichment of one party . . . at the expense of another . . . ." Malonis v. Harrington, 442 Mass. 692, 697 (2004). Although "clean hands" are important in determining equitable relief, we also have recognized that this is not an absolute proposition, as the purpose of the doctrine is to allow courts to produce a just result. Walsh v. Atlantic Research Assocs., 321 Mass. 57, 62 (1947). The proper focus is on the value of the benefit conferred. In a construction contract, "[t]he amount of recovery on a claim based in quantum meruit is the fair and reasonable value of material and labor supplied to the benefiting party." J.A. Sullivan Corp., supra at 797. "It is

not the policy of our law to award damages which would put [the nonbreaching party] in a better position than if the [breaching party] had carried out [its] contract." Ficara v. Belleau, 331 Mass. 80, 82 (1954). The nonbreaching party is "entitled to be made whole and no more." Id. See J.A. Sullivan Corp., supra at 794 (principle of equity and fairness cautions against "produc[ing] a windfall").

In the instant case there was, without dispute, substantial performance by the contractor. A critical and complex project providing a fiber optic network for western and north central Massachusetts has been completed according to its design. The project was, however, delayed. The cause of those delays is bitterly disputed in the record. G4S has raised a genuine issue of material fact that MTPC is responsible for those delays due to its failure to complete the make-ready work on time.

More complicated is the good faith requirement. The motion judge concluded that it was undisputed that G4S did not act in good faith given its numerous delayed payments to contractors and false certifications. She held that intentional violation of these contract provisions precluded a finding of good faith fully to perform. Support for this holding and the short-circuiting of the rest of the equitable analysis certainly exists, in a line of older cases that the judge properly cited. For example, in J.A. Sullivan Corp., 397 Mass. at 797, quoting

_Andre_, 305 Mass. at 516, we reiterated that "[g]enerally, '[i]n the absence of special exculpating circumstances an intentional departure from the precise requirements of the contract is not consistent with good faith in the endeavor fully to perform it, and unless such departure is so trifling as to fall within the rule de minimis, it bars all recovery." The simplicity and severity of this approach, which dates back to _Sipley_ v. _Stickney_, 190 Mass. 43, 46 (1906), and _Homer_ v. _Shaw_, 177 Mass. 1, 5 (1900), has, however, been criticized in leading treatises on contract law. See 8 C.M.A. McCauliff, Corbin on Contracts § 36.8, at 354 (J.M. Perillo ed., rev. ed. 1999); S. Williston, Contracts § 842, at 2364 n.4 (rev. ed. 1936). This rule also has been questioned, and even distinguished by this court, but this older line of cases has not been overruled. See _Walsh_, 321 Mass. at 62 (describing _Sipley_ doctrine as rigid rule of law that has been criticized as "too severe"). We expressly overrule this line of cases and rearticulate the doctrine of quantum meruit today.

We conclude that intentional breaches, even those involving material breaches, alone are not dispositive of the right to equitable relief, at least when such breaches do not relate to the construction work itself. Good faith is a requirement for recovery under quantum meruit, but ruling in equity, this requirement is not one that is "too rigid and unyielding for the

practical accomplishment of justice." J.A. Sullivan Corp., 397 Mass. at 797, quoting Morello v. Levakis, 293 Mass. 450, 453 (1936). We have emphasized that "[t]he doctrine of clean hands is not one of absolutes and should be so applied as to accomplish its purpose of promoting public policy and the integrity of the courts." Walsh, 321 Mass. at 66 (allowing recovery in quantum meruit even for plaintiff who intentionally committed breach of employment contract provision). There is no simple formula to apply here, but rather numerous factors to analyze. We thus conclude that in evaluating the contractor's good faith and right to recover under quantum meruit, we must consider the contract performance as a whole, taking into account both parties' actions, the different contractual breaches and the damages they caused, and most importantly the value of the project provided as compared to the amount paid for that work. We must, in the end, balance the equities and produce a just result. See id. (in quantum meruit case, court declined to deprive plaintiff of all earnings during employment despite bad faith material breach of employment contract). See also Meehan v. Shaughnessy, 404 Mass. 419, 438-439 (1989) (departing law firm partner did not forfeit accrued profits despite intentional breach of partnership contract and fiduciary duties because there was no causal connection between law firm's claimed losses and breaches).

Here, G4S completed the project as specified, albeit with delays. MTPC deducted $4 million, of which a significant sum was damages for delay. Whether one party or the other or both were responsible for the delays remains disputed on this record. Resolution of this issue has an impact on the over-all balancing of the equities in the instant case. If MTPC was responsible for some or all of those delays and nevertheless withheld the amount, MTPC's own contractual violations would need to be considered in the equitable analysis. If those violations were intentional, that would also be a factor in the balancing of equities. Furthermore, G4S has introduced evidence to support its claim that it has performed $10 million in uncompensated work because of MTPC's failure to perform make-ready work. If G4S's $10 million REA has merit, this represents a significant amount of value supplied to MTPC without cost and may constitute a windfall. See J.A. Sullivan Corp., 397 Mass. at 794; Ficara, 331 Mass. at 82. It would thus "work great hardship to deprive" G4S of compensation for extra work conferred over the three-year project given that the design and construction of the network was satisfactory. See Walsh, 321 Mass. at 66.

Finally, although there was not good faith and clean hands in the context of prompt payments to subcontractors or truthful certifications to MTPC, it is unclear from the submitted record whether there is any causal connection between these contractual

violations and any damages to MTPC. It is undisputed that the work had been done prior to the certifications. It also appears from this record that the subcontractors, not MTPC, suffered the consequences of the delayed payments by continuing to work despite the payment delays. The record before us, as the motion judge recognized, contains no evidence that the delayed payments or false certifications had an impact on or affected the construction, the delays in the completion of the project resulting in the withholding of liquidated damages, or the $10 million of extra work alleged in the REA.[19] See Meehan, 404 Mass. at 438-439 (no causal connection between breach and damages claimed).

We conclude that resolution of these disputed factual questions is necessary to determine whether equitable relief is appropriate in the instant case. The responsibility for the delay, the amount of extra uncompensated work, and the presence or absence of any causal connection between the intentional breaches and any damage to MTPC are all relevant to a just resolution of the quantum meruit claim. If the delays were caused by MTPC, G4S has performed and paid for $10 million in

---

[19] The lack of impact on the construction appears to be because of the patience and accommodation of the subcontractors that put up with, and even suffered from, G4S's misconduct, without complaining to MTPC or demanding direct payment as was their right.

extra work to complete the project, and the payment delays to subcontractors and false certifications had no impact on the project's construction or completion date, it would be inequitable for MTPC to withhold compensation from G4S for the reasonable value of its labor and materials in excess of the amounts already paid to G4S. Meehan, 404 Mass. at 447. See Harness Tracks Sec., Inc., v. Bay State Raceway, Inc., 374 Mass. 362, 367-368 (1978).

c. Fraud. MTPC contends that its counterclaim against G4S for fraud was improperly dismissed. The motion judge sua sponte dismissed MTPC's fraud claim against G4S. She relied on Szalla v. Locke, 421 Mass. 448, 454 (1995), in which this court held: "Where the same acts cause the same injury under more than one theory, duplicative damage recoveries will not be permitted." Applying Szalla, the motion judge reasoned that "the conduct that forms the basis of MTPC's fraud claim is precisely the same as that which caused this Court to conclude that G4S had necessarily forfeited its affirmative claims against MTPC. As a consequence . . . , [MTPC] no longer had to justify the $4 million it retained of the Contract balance; the upshot was that it was effectively provided with an award that more than covered any loss that it suffered as a result of paying G4S prematurely."

We agree that summary judgment on the fraud claim may be

appropriate only under a duplicative damages analysis.  However, "where the acts complained of . . . are factually separable and distinguishable . . . , there is no error in permitting separate recoveries for separable injuries."  Calimlim v. Foreign Car Ctr., Inc., 392 Mass. 228, 236 (1984).  "Permitting awards under several counts where claims and injuries are factually distinguishable, but disallowing such recovery where they are not, will serve to avoid over or under compensation."  Id.

Here, there may be separable and distinguishable acts forming the basis of recovery under the breach of contract and fraud claims.  A fact finder could determine that the delayed completion of the project could be the basis for the breach of contract claim and the false certifications that subcontractors were timely paid could be the basis for the fraud claim.  MTPC withheld $4 million as separable recovery for the breach of contract because of the delay, using the liquidated damages provision to calculate the amount of the withholding.[20]  MTPC additionally claims that the false certifications caused it to

---

[20] The fact that the fraudulent certifications and delayed payments to subcontractors also provide a basis for breach of contract is not dispositive.  If G4S was responsible for the delays, an issue that cannot be decided on summary judgment, those delays provided a much more straightforward basis for calculating damages for breach of contract than the false certifications.

pay G4S prematurely, resulting in the loss of $1.67 million, which it asserts is another injury for which it thus is entitled to separable recovery.[21]  Whether this claim has merit and whether such calculations of damages are correct require further fact finding, but some recovery, at least for the loss of the time value of money, may be justified.

Whether the monetary loss for MTPC due to fraud is less than the monetary loss due to breach of contract also should be determined.  This appears to depend on who was responsible for the delays; G4S's recovery, if any, under quantum meruit; and whether the losses due to fraud claimed by MTPC have been grossly inflated.  Whether the damages, if any, caused by the false certifications are duplicative thus cannot be determined on this record.  We therefore reverse the allowance of summary judgment on the fraud claim.

3.  Conclusion.  For the reasons discussed, we affirm the summary judgment decision on the breach of contract claim and reverse the summary judgment decision on the quantum meruit and

---

[21] MTPC and G4S also dispute the amount of loss, asserting it to be $1.67 million and $1,757.48, respectively.  MTPC calculated $1.67 million based on lost interest accrued at the prime rate of 3.25 per cent per annum interest from the date of each payment until June, 2, 2014, the date of MTPC's last payment to G4S.  G4S, in turn, asserts that lost interest based on alleged late subcontractor payments would result only in $1,757.48 based on a thirty-day yield of 0.22 per cent interest calculated for only the period that the payment was late.

fraud claims.  We remand the matter to the Superior Court for proceedings consistent with this opinion.

<u>So ordered</u>.