NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13405


COLUMBIA PLAZA ASSOCIATES  vs.  NORTHEASTERN UNIVERSITY.



Suffolk.      October 2, 2023. - February 29, 2024.

Present:  Budd, C.J., Gaziano, Lowy, Kafker, Wendlandt,
& Georges, JJ.[1]



"Anti-SLAPP" Statute.  Redevelopment Authority.  Practice,
    Civil, Motion to dismiss, Summary judgment, Retroactivity
    of judicial holding, Fraud, Attorney's fees.  Contract,
    Construction contract, Performance and breach, Implied
    covenant of good faith and fair dealing, Unjust enrichment,
    Promissory estoppel.  Constitutional Law, Right to petition
    government.  Unlawful Interference.  Unjust Enrichment.
    Declaratory Relief.  Consumer Protection Act, Unfair or
    deceptive act.  Fraud.  Frauds, Statute of.




    Civil action commenced in the Superior Court Department on
December 15, 2020.

    A special motion to dismiss or, in the alternative, a
motion to dismiss and a motion for summary judgment were heard
by Rosemary Connolly, J.; a motion for attorney's fees was heard
by Jackie A. Cowin, J., and entry of judgment was ordered by
her.

    The Supreme Judicial Court granted an application for
direct appellate review.

---

[1] Justice Lowy participated in the deliberation on this case
prior to his retirement.

Henry F. Owens, III (Richard K. Latimer & Robert Patrick Cooper also present) for the plaintiff.

Daryl J. Lapp (Elizabeth H. Kelly also present) for the defendant.

The following submitted briefs for amici curiae:

Robert S. Mantell, Audrey Richardson, & Emma Hornsby for Massachusetts Employment Lawyers Association & others.

Robert C. Ross for NAIOP Massachusetts, Inc.

Jeffrey J. Pyle for New England First Amendment Coalition.

Mark S. Furman & Emily C. Shanahan for JACE Boston, LLC, & another.

Ruth A. Bourquin for American Civil Liberties Union of Massachusetts, Inc.

KAFKER, J.  This case is before us after a judge in the Superior Court allowed Northeastern University's (Northeastern's) special motion to dismiss various claims, pursuant to G. L. c. 231, § 59H, and otherwise dismissed or entered summary judgment in favor of Northeastern on the plaintiff's remaining claims arising out of plans to develop a disputed parcel of land.  We conclude that all the claims were properly dismissed.  We also analyze the judge's ruling on the special motion to dismiss using a revised framework for assessing such motions under § 59H, known more commonly as the anti-SLAPP statute.  That revised framework, and the reasons necessitating such revision, have been set out in detail in a companion opinion issued today.  See Bristol Asphalt Co. v. Rochester Bituminous Prods., Inc., 493 Mass.    (2024) (Bristol Asphalt).  Applying this framework, and upon consideration of the remaining issues before us on appeal, we affirm.

1.  Background.  a.  Facts.[2]  i.  Linkage program.  In the late 1980s, the city of Boston (city), through the Boston Redevelopment Authority (BRA), created a "Parcel-to-Parcel Linkage Program" (linkage program) to develop land in its Roxbury section.  The linkage program sought to promote urban revitalization and to increase opportunities for minority participation in development by "linking" two parcels of property -- i.e., development of a profitable downtown property was linked to the development of property in Roxbury considered to be less commercially attractive.  A development team, with a required minority partner, was to be selected by the BRA.  An area identified for development in Roxbury, designated as parcel 18 and consisting of five subparcels (18-1A, 18-1B, 18-2, 18-3A, and 18-3B), is at the heart of the instant dispute.

ii.  1991 agreement and foreclosure.  The plaintiff, Columbia Plaza Associates (CPA), was formed for the purpose of participating in the linkage program and developing parcel 18.  In 1991, CPA entered into a sale and construction agreement with

---

[2] On appeal from a grant of a special motion to dismiss, we state the facts as set forth in the pleadings and affidavits before the trial court.  See North Am. Expositions Co. Ltd. Partnership v. Corcoran, 452 Mass. 852, 854 & n.5 (2009).  Here, because the plaintiff moved for summary judgment in response to the defendant's special motion to dismiss, and the court considered all the parties' pleadings and documentary evidence in ruling on both the special motion to dismiss and the motions for summary judgment, we do the same on appeal.

the BRA (1991 agreement) in which the BRA agreed to sell and CPA agreed to buy parcel 18 or certain subparcels thereof as designated by CPA and approved by the BRA, and CPA agreed to develop the land according to a master development plan approved by the BRA and the city's zoning commission.[3] Specifically, under the 1991 agreement, CPA was to inform the BRA of its desire to develop and purchase a particular subparcel. After providing notice, CPA was then supposed to "proceed in good faith and with all reasonable efforts" to satisfy the various conditions imposed on the sale and development under the 1991 agreement, including submission and approval of a development plan.

Under the 1991 agreement, CPA was allowed to mortgage the subparcels to secure debt related to their acquisition and development. A party acquiring parcel 18 in foreclosure was limited to the three following options: (1) complete construction on the subparcels in compliance with the requirements of the 1991 agreement, (2) sell title to the subparcels to a purchaser who would assume all "covenants, agreements and obligations of [CPA]" under the 1991 agreement,

---

[3] CPA formed a joint venture with another entity for the purpose of developing the subparcels. CPA is the successor in interest to this joint venture, and for simplicity, we shall refer to actions or obligations undertaken by the joint venture as being undertaken by CPA.

or (3) reconvey fee simple title to the subparcels to the BRA. CPA obtained a mortgage on parcel 18 and built an office building on subparcel 18-1B. For a short time, this building housed the registry of motor vehicles. However, by the mid-1990s, the registry had vacated this location and the building was condemned. CPA's mortgage was foreclosed upon, and an affiliate of CPA's lender acquired parcel 18 in a foreclosure sale. Northeastern subsequently purchased the land from this affiliate in November 1997. The quitclaim deed conveying parcel 18 to Northeastern also conveyed the affiliate's "rights arising under [the 1991 agreement], between [the BRA] and [CPA]," and provided that Northeastern would "assume the obligations set forth in [the 1991 agreement]."

iii. 1999 agreement. On June 30, 1999, the BRA, CPA, and Northeastern executed a "Second Amended and Restated Sale and Construction Agreement" (1999 agreement). The 1999 agreement expressly rendered the 1991 agreement "null and void and of no further force and effect." The 1999 agreement also stated that Northeastern intended "individually and/or through an affiliated entity of Northeastern meeting the definition of 'Developer'" to develop parcel 18. The 1999 agreement defined "Developer" to mean "Northeastern or an affiliated entity of Northeastern, specifically including coventures with CPA, designated by Northeastern to develop the applicable phase." The subparcels,

referred to as "Phase Parcels," were designated for separate development from one another, with subparcel 18-2 selected for the construction of a parking garage (garage parcel), and the remaining subparcels intended for the construction of buildings.

Additionally, the parties agreed in 1999 to enter into a joint venture to acquire the garage parcel (second 1999 agreement). The second 1999 agreement also contained a provision whereby the parties agreed to enter into a joint venture agreement to develop a new building on subparcel 18-3A. Any such joint venture agreement was to be executed by the parties no later than six months after the closing date of the second 1999 agreement or a later date if the parties mutually agreed on an extension. However, the parties never executed any such joint venture agreement within the six-month period and did not agree to extend the deadline.

iv. 2007 development plan. Over the next six years following the 1999 agreement, the parties explored the possibility of developing together a hotel on subparcel 18-3A, including hiring an outside firm to assess its economic feasibility. However, the parties never entered into any formal agreement and, in 2007, Northeastern, in consultation with CPA and the BRA, abandoned plans to develop a hotel or other commercial building on subparcel 18-3A. CPA agreed to the removal of subparcels 18-3A and 18-3B from the development plans

so that Northeastern could build a dormitory on those subparcels.  In turn, Northeastern agreed to seek to develop a hotel on subparcel 18-1A "in partnership" with CPA.  Thereafter, Northeastern and the BRA executed a new development plan (2007 development plan).  The 2007 development plan stated that "Northeastern University in partnership with [CPA] . . . intends to proceed with construction on [subparcel 18-1A] (currently anticipated for use as a hotel)."  The 2007 development plan also formalized the removal of subparcels 18-3A and 18-3B from the master development plan and the linkage program.

Between 2006 and 2008, the parties discussed development of a hotel on subparcel 18-1A.  After several months of silence from CPA in 2008, Northeastern sent a letter to CPA on March 26, 2008, seeking to reinitiate discussions.  CPA responded on April 2, 2008, stating that it intended to review the appropriate documents in order to foster an "informed dialogue."  On May 14, 2008, Northeastern sent a letter to follow up with CPA, noting that while CPA's previous correspondence had indicated readiness to discuss the project in "two to three weeks," CPA had yet to respond to Northeastern's request to meet, and that, "despite repeated attempts," Northeastern had had "no substantive discussions" with anyone from CPA in the preceding five months.

Nearly one year later, in March 2009, Northeastern communicated to CPA that while the economic situation had

deteriorated, raising concerns about the financial viability of the hotel project, Northeastern remained "dedicated to following through on its commitment to . . . proceed with the development of a hotel on Parcel 18."  Northeastern also noted the possibility of obtaining funding for the hotel project and requested a meeting to discuss financing.  Afterward, communications between Northeastern and CPA fell silent.

v.  Subsequent court proceedings.  In 2013, CPA filed suit against Northeastern, raising various contractual and other claims arising out of allegations that Northeastern was contractually required to work with CPA in any development of subparcels 18-3A and 18-3B and that Northeastern's decision to build a dormitory on those parcels wrongfully deprived CPA of its development rights (2013 litigation).  CPA asserted that Northeastern had concealed its intentions and falsely represented to the BRA that it remained in partnership with CPA in order to obtain the necessary BRA approvals for construction of the dormitory.  After a trial, a judge in the Superior Court entered judgment for Northeastern.  On appeal, the Appeals Court affirmed the decision of the trial judge, and this court denied CPA's application for further appellate review.  See Columbia Plaza Assocs. v. Northeastern Univ., 93 Mass. App. Ct. 1113 (2018).

On May 9, 2017, CPA sent a letter to the BRA's successor, the Boston Planning and Development Administration (BPDA), demanding that it "compel Northeastern to present CPA with a joint venture for [subparcel 18-1A, i.e., the proposed hotel project], to provide a significant return to CPA, as Northeastern . . . clearly will not do [so] on its own initiative." On May 25, 2017, Northeastern sent a letter to the BPDA denying CPA's claims. Northeastern asserted that it owned all of parcel 18, including "all of the development rights" and that CPA did not own any "development rights in Parcel 18 or any of its sub-parcels." In support, Northeastern pointed to the trial judge's decision in the 2013 litigation, arguing that she had ruled that "CPA does not have -- and never had -- any actual 'development rights' in relation to" subparcel 18-3A or 18-1A.

In June 2019, CPA contacted Northeastern about developing a hotel on subparcel 18-1A, but Northeastern rejected CPA's outreach, again claiming CPA had no interest of any kind in subparcel 18-1A. In November 2019, Northeastern notified the BPDA of its intent to develop subparcel 18-1A for its own use.

b. Procedural history. In December 2020, CPA commenced the instant suit against Northeastern, alleging breach of contract (counts I and II), breach of the implied covenant of good faith and fair dealing (count III), interference with advantageous economic relations (count IV), unjust enrichment

(count V), commercial fraud (count VI), and unfair or deceptive acts in violation of G. L. c. 93A, § 11 (counts VII and VIII), and seeking declaratory and injunctive relief (counts IX and X, respectively). Northeastern filed a special motion to dismiss pursuant to G. L. c. 231, § 59H, or, in the alternative, a motion to dismiss under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). CPA in turn moved for partial summary judgment on counts I, II, III, VII, and VIII. A judge in the Superior Court (motion judge) allowed Northeastern's special motion to dismiss under § 59H, with respect to CPA's claims of fraud, as well as CPA's claims of unfair or deceptive acts in violation of G. L. c. 93A, § 11, insofar as those counts were based on allegations of misrepresentations by Northeastern to the BPDA. The motion judge denied the special motion to dismiss as to all remaining counts, but allowed Northeastern's motion to dismiss, pursuant to rule 12 (b) (6), as to CPA's claims for interference with advantageous economic relations, unjust enrichment, declaratory judgment, and injunctive relief. The motion judge granted summary judgment in favor of Northeastern on all remaining claims.[4] CPA appealed, and we accepted this case on direct appellate review.

---

[4] In its opposition to CPA's motion for partial summary judgment, Northeastern requested that the court enter summary judgment in favor of Northeastern on the counts at issue. With

2.  Special motion to dismiss.  a.  Simplified anti-SLAPP framework.  In Bristol Asphalt, 493 Mass. at    , also issued today, we have simplified and clarified the existing framework for assessing special motions to dismiss filed under G. L. c. 231, § 59H, the so-called anti-SLAPP statute, and explained in detail our reasons for doing so.

Under the first stage of this revised framework, the special motion proponent has a threshold burden to show that the challenged claim is based solely on the proponent's exercise of its right to petition, with no "substantial basis other than or in addition to the petitioning activities implicated." Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 167 (1998).  As we clarify today in Bristol Asphalt, 493 Mass. at    , we no longer parse the factual basis for a claim to determine if some portion of the claim could independently support the asserted cause of action, so as to permit partial dismissal of the claim under Blanchard v. Steward Carney Hosp., Inc., 477 Mass. 141, 155-156 (2017) (Blanchard I), S.C., 483 Mass. 200 (2019).  Rather, if the special motion proponent cannot demonstrate that the claim is based solely on the

_____

the parties' agreement, the motion judge ruled on these counts using a summary judgment standard.

proponent's own petitioning activity, the special motion must be denied.[5]

If, however, the claim is based solely on the special motion proponent's petitioning activity, the burden shifts to the special motion opponent. See G. L. c. 231, § 59H, first par. To defeat the motion at this second stage, the special motion opponent must show by a preponderance of the evidence that the special motion proponent's petitioning activity (1) was devoid of any reasonable factual support or any arguable legal basis; and (2) caused the special motion opponent actual injury. See id. If the special motion opponent makes both showings, the special motion is denied. Otherwise, the special motion is allowed.

As we explain in Bristol Asphalt, 493 Mass. at  , we abandon the "second path" for defeating the special motion, which allowed a special motion opponent to prevail by demonstrating that its claims were "colorable" and had not been raised for the primary purpose of chilling the special motion proponent's legitimate petitioning activity. See Blanchard I, 477 Mass. at 159-161. Additionally, as we also clarify in our

---

[5] This revision to the existing anti-SLAPP framework is particularly relevant in the instant case as the motion judge employed such analysis to dismiss the portion of the G. L. c. 93A claims that were based solely on petitioning activity.

companion opinion, a ruling on a special motion to dismiss is subject to de novo review on appeal.

b. Applicability of simplified anti-SLAPP framework to instant case. As an initial matter, we address whether the simplified anti-SLAPP framework that we set forth today applies to the instant case. When this court construes a statute, our holding is presumptively given retroactive application, although we retain discretion to apply the rule prospectively in limited circumstances. See McIntire, petitioner, 458 Mass. 257, 261 (2010), cert. denied, 563 U.S. 1012 (2011) ("Where a decision does not announce new common-law rules or rights but rather construes a statute, no analysis of retroactive or prospective effect is required because at issue is the meaning of the statute since its enactment"); Mouradian v. General Elec. Co., 23 Mass. App. Ct. 538, 542 n.3 (1987), quoting 1 K.C. Davis, Administrative Law Treatise § 5.09 (1958) (Davis) ("If an interpretative rule is merely an interpretation of a statute, and if the meaning of the statute has been there from the time of its original enactment, then no problem of a retroactive interpretative rule can arise, for either the interpretative rule expresses the true meaning of the statute or it does not; if it does, then that is what the statute has always meant and the rule has not changed the law"). See also Eaton v. Federal Nat'l Mtge. Ass'n, 462 Mass. 569, 587-588 (2012) (explaining

presumption of retroactive application, with prospective-only application being reserved for exceptional circumstances).

Our holding today is intended to "give effect to the clear meaning of a statute," a meaning that has not changed for these purposes since its original enactment. Dellorusso v. PNC Bank, N.A., 98 Mass. App. Ct. 84, 87 (2020). See Davis, supra. This "purpose is best accomplished through retroactive application." Dellorusso, supra at 87-88. In today's decision, we also return to the framework that governed special motions to dismiss for twenty years, until our holding in Blanchard I. Thus we are returning to an earlier interpretation, rather than developing a brand new one, limiting any possible disruptive effect of imposing the change at issue. Accordingly, the simplifications to our existing anti-SLAPP framework, set forth in Bristol Asphalt, 493 Mass. at    , also issued today, are applicable to cases in which an anti-SLAPP motion or appeal remains pending as of this court's issuance of the rescript in Bristol Asphalt.

i. Stage one: Northeastern's threshold burden. Applying the simplified anti-SLAPP framework, Northeastern had a threshold burden to show that the claims at issue were based solely on Northeastern's exercise of its right of petition, as defined in G. L. c. 231, § 59H. Northeastern contended that all of CPA's claims were based solely on Northeastern petitioning the BPDA to unilaterally develop subparcel 18-1A. However, the

alleged factual basis for most of CPA's claims was not solely Northeastern's petitioning of the BPDA, but the existence of contractual agreements between the parties. That is, the alleged conduct that gave rise to CPA's claims sounding in contract was Northeastern's decision to enter into agreements with CPA, and then act in violation of CPA's alleged rights under those agreements. See Duracraft Corp., 427 Mass. at 165 ("Many preexisting legal relationships may properly limit a party's right to petition, including enforceable contracts in which parties waive rights to otherwise legitimate petitioning"). Accordingly, the motion judge properly found that Northeastern failed to meet its threshold burden as to the claims for breach of contract (counts I and II), breach of the implied covenant of good faith and fair dealing (count III), interference with advantageous economic relations (count IV), unjust enrichment (count V), and declaratory and injunctive relief (counts IX and X), as each of these claims was based on preexisting contractual agreements, not solely communications with the BPDA. See id. at 168 (nondisclosure agreement constituted substantial basis other than defendant's petitioning activity to support breach of contract claims).

The motion judge, however, distinguished CPA's claims for unfair or deceptive acts in violation of G. L. c. 93A, § 11, which are based upon both the allegation that Northeastern

petitioned the BPDA in violation of CPA's alleged contractual rights, as well as the allegation that Northeastern "misrepresent[ed] to the BPDA that CPA's rights on [subparcel] 18-1A were extinguished." The motion judge analyzed the c. 93A claims under each theory of liability, in order to determine whether a portion of either claim was based solely on Northeastern's petitioning activity, in accord with the augmented framework set forth in Blanchard I, 477 Mass. at 143 (holding that defendant may meet threshold burden as to portion of claim that is based solely on petitioning activity).

Applying this augmented framework, the motion judge determined that Northeastern was entitled to dismissal of these claims in part. However, under the simplified anti-SLAPP framework we adopt today, such parsing analysis is not appropriate. Because a substantial factual basis for the c. 93A claims was the allegation that Northeastern acted in violation of its contractual agreements with CPA, Northeastern failed to meet its threshold burden of showing that these claims are based solely on its petitioning activity. Accordingly, the special motion to dismiss should have been denied as to both c. 93A claims.[6]

---

[6] Although we do not join in the conclusion reached by the motion judge that Northeastern was entitled to dismissal under G. L. c. 231, § 59H, as to a portion of the c. 93A claims, we

Finally, we address CPA's remaining claim for "commercial fraud." Unlike the counts described above, this claim appears to be based entirely on the allegation that Northeastern "false[ly] represent[ed] to the BPDA that a Superior Court judge found that CPA has no remaining development rights on Parcel 18," in reference to the outcome of the 2013 litigation concerning subparcel 18-3A. Because this allegation relied on a written statement that Northeastern submitted to a governmental agency, the BPDA, it constituted petitioning activity. See G. L. c. 231, § 59H, sixth par. (defining petitioning activity to include "any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding"). See also North Am. Expositions Co. Ltd. Partnership v. Corcoran, 452 Mass. 852, 862 (2009), and cases cited (statements made to governmental bodies need not be made within context of formal government proceedings to constitute petitioning activity). Thus, Northeastern met its threshold burden, as the special motion proponent, with respect to count VI of CPA's complaint.

ii. Stage two: CPA's burden. For count VI, the burden then shifted to CPA, the party opposing the special motion, to show that Northeastern's petitioning activity (1) was devoid of

_____

nonetheless affirm the entry of judgment in favor of Northeastern on these claims, for reasons detailed infra.

any reasonable factual support or any arguable legal basis; and (2) caused CPA actual injury.  See G. L. c. 231, § 59H.  Here, CPA focused on a passage toward the end of Northeastern's letter, which, after summarizing the 2013 litigation, stated that, "as the Superior Court has ruled, CPA does not have -- and never had -- any actual 'development rights' in relation to [subparcel] 18-3A or 18-1A."

Far from being "devoid" of reasonable support, Northeastern's statement was squarely supported by the judge's ruling in the 2013 litigation.  Although the 2013 litigation concerned whether CPA's "rights" to parcel 18 had been extinguished in subparcel 18-3A specifically, and not 18-1A, the judge defined the nature of CPA's "rights" as follows:  "they were not much better than a fishing license:  they essentially gave CPA the opportunity to become a developer on a project provided that it met the BRA's rigorous prerequisites, which included a demonstration that it had a specific and economically feasible development plan" (emphasis in original). Northeastern's letter stated that CPA did not have "any actual 'development rights'" to subparcel 18-1A because its "rights" amounted to no more than an opportunity to participate as a developer in the event that certain prerequisites were met, effectively paraphrasing the above-quoted language from the

judge's decision.  Accordingly, we affirm the allowance of the special motion to dismiss count VI of CPA's complaint.

3.  Adjudication of remaining claims.  The motion judge disposed of CPA's remaining claims by ruling on Northeastern's motion to dismiss for failure to state a claim and the parties' cross motions for summary judgment.  On appeal, both types of motions are subject to de novo review.  See Santos v. U.S. Bank Nat'l Ass'n, 89 Mass. App. Ct. 687, 691 (2016).  Where, as here, both parties have moved for summary judgment, see note 4, supra, we view the evidence in the light most favorable to the party against whom judgment was entered -- here, CPA -- to determine whether all material facts have been established such that the moving party is entitled to judgment as a matter of law.  Twomey v. Middleborough, 468 Mass. 260, 267 (2014).  See Abrahamson v. Estate of LeBold, 89 Mass. App. Ct. 223, 225 (2016) (applying standard of review applicable to summary judgment where motion to dismiss was converted to motion for summary judgment).

a.  Count I -- breach of 1999 agreement.  CPA's first breach of contract claim is based upon its contention that Northeastern committed a breach of the 1999 agreement by rejecting CPA's request to develop subparcel 18-1A in June 2019 and notifying the BPDA of Northeastern's intent to develop that subparcel for its sole institutional use.  We review the record in the light most favorable to CPA.  That record nonetheless

reveals that after the 1999 agreement, CPA lost development rights in all the subparcels, except for the right to develop the garage parcel.

To prevail on a claim for breach of contract, a plaintiff is required to demonstrate that "there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016). To determine the intent of contracting parties, we consider the "words used by the parties, the agreement taken as a whole and the surrounding facts and circumstances." MCI WorldCom Communications, Inc. v. Department of Telecomm. & Energy, 442 Mass. 103, 112 (2004). If the words of a contract are clear, they are dispositive as to the meaning of the contract. See EventMonitor, Inc. v. Leness, 473 Mass. 540, 549 (2016).

Section 102(r) of the 1999 agreement states that "for every Phase, the Developer shall be Northeastern or an affiliated entity of Northeastern, specifically including coventures with CPA, designated by Northeastern to develop the applicable Phase . . . . It is hereby agreed that the Developer of the Garage Parcel shall be the Northeastern/CPA Venture." While this language provides CPA with the right to develop the garage

parcel with Northeastern, it does not grant CPA development rights in any of the other subparcels. Rather, the 1999 agreement specifies that Northeastern "shall be" the developer for every subparcel and that Northeastern <u>may</u> designate an affiliated entity, specifically including CPA, as a developer for the other subparcels.

If the parties intended to make CPA a codeveloper for every subparcel, the language in § 102(r) allowing Northeastern to "designate" CPA as a developer and agreeing that Northeastern and CPA "shall be" the garage parcel developers would be superfluous. <u>Gibraltar Fin. Corp</u>. v. <u>Lumbermens Mut. Cas. Co</u>., 400 Mass. 870, 872 (1987) ("It is a standard rule of construction that interpretations which result in meaningless words are to be avoided").

Moreover, the 1999 agreement extinguished any remaining rights in parcel 18 that CPA might have had under the 1991 agreement. Section 101 of the 1999 agreement states that the 1991 agreement is "null and void and of no further force and effect." The intent of § 101 is unambiguous: the 1991 agreement is no longer in force and the parties' rights and obligations are now governed by the 1999 agreement.

CPA nonetheless argues that language in the preamble reveals an intent to amend and restate the 1991 agreement, thus incorporating CPA's development rights under the 1991 agreement

into the 1999 agreement:  "the [BRA], Northeastern and CPA wish to further amend and restate the terms of the Original Sale Agreement and Original Amended Sale Agreement as set forth herein."  While recitals may assist us in interpreting the body of the 1999 agreement, they do not create enforceable rights in and of themselves.  See Cullinet Software, Inc. v. McCormack & Dodge Corp., 400 Mass. 775, 776 n.1 (1987).  Here, the general language contained in the preamble is undercut by the more specific statement in § 101 that the 1991 agreement is null and void.

CPA also posits that § 302 of the 1999 agreement gave it veto rights over development on all of parcel 18.  Section 302 refers to the "Master Plan and the . . . Development Plan for each Phase [(i.e., the development plans for each subparcel)], as they may be amended and revised by the agreement of the parties thereto."  CPA reads this as requiring that Northeastern obtain agreement of all the parties to the 1999 agreement (i.e., both CPA and the BRA) before making changes to the development plans for any of the subparcels.  Thus, CPA would have a veto right over the development of subparcel 18-1A, even if the 1999 agreement extinguished its development rights.  A more sensible reading is that Northeastern must get agreement from the parties to each individual development plan for any modifications to that development plan.  As CPA was only designated as a

"Developer" for the garage parcel, Northeastern only needed CPA's permission to make changes to the development plan for the garage parcel.  CPA's position is further undermined by the fact that the 1999 agreement reserves Northeastern's right to amend the master development plan and submit a new development plan, subject to approval by the BRA and the city's zoning commission. Nowhere in this section is CPA's approval required or discussed.

"[A]n unambiguous agreement must be enforced according to its terms."  Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992).  By its terms, the 1999 agreement states that (1) the 1991 agreement, including any development rights conferred to CPA, was rendered "null and void," and (2) except for the garage parcel, CPA did not have any development rights in parcel 18.  Therefore, Northeastern did not commit a breach of the 1999 agreement by seeking to unilaterally develop subparcel 18-1A and the Superior Court correctly granted summary judgment on count I in Northeastern's favor.

b.  Count II -- breach of 2007 agreement.  CPA's second breach of contract claim centers around its assertion that Northeastern's attempt to unilaterally develop subparcel 18-1A violated an unwritten agreement between the parties in 2007 (2007 agreement), in which CPA surrendered its rights in subparcels 18-3A and 18-3B in exchange for development rights on subparcel 18-1A.  CPA appears to find proof of the 2007

agreement in the 2007 development plan, in which Northeastern removed subparcels 18-3A and 18-3B from the original development plan and stated its intent to develop a hotel on subparcel 18-1A "in partnership" with CPA. CPA's second breach of contract claim also fails.

Viewed in the light most favorable to CPA, CPA had no contractual rights in subparcel 18-1A. The parties had previously discussed possible projects on various subparcels, including subparcels 18-3A and 18-3B, but none of these discussions ever ripened into a final, written agreement. As of 2007, the parties had conducted some preliminary discussions around developing a hotel on subparcel 18-3A. When Northeastern decided to develop a dormitory on subparcels 18-3A and 18-3B, it appears the parties agreed to shift the possible hotel development to subparcel 18-1A. Again, the record indicates that, for a time, both parties engaged in some discussions around developing a hotel but failed to reach an agreement that would give CPA enforceable rights. Nothing in the record indicates that Northeastern ever agreed to a binding commitment to build a hotel on subparcel 18-1A. Cf. Mendel Kern, Inc. v. Workshop, Inc., 400 Mass. 277, 280-281 (1987) (letter of intent to enter into lease was not binding promise because it merely expressed "intention to do something" at future date). Therefore, CPA had no contractual rights to subparcel 18-1A and

Northeastern was under no binding obligation to build a hotel with CPA on subparcel 18-1A.

Moreover, any oral agreement would be unenforceable under the Statute of Frauds. See G. L. c. 259, § 1. Nor could the 2007 development plan render a verbal agreement enforceable, as it was not signed by either Northeastern or CPA. See id. (agreement must be "in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized").

The 2007 development plan similarly does not "contain directly, or by implication, all of the essential terms of the parties' agreement." See Simon v. Simon, 35 Mass. App. Ct. 705, 709 (1994) (holding lease agreement did not satisfy Statute of Frauds where it failed to define lease duration). It states that Northeastern, in partnership with CPA,

> "intends to proceed with construction on [subparcel 18-1A] (currently anticipated for use as a hotel) as contemplated by the [2007] Development Plan, continuing the revitalization of the development now known as Renaissance Park. The purpose of this Development Plan is to remove [subparcels 18-3A and 18-3B] . . . from the Development Area and to rescind the Master Plan, prior to proceeding with development on [subparcel 18-1A]."

While this suggests the outline of a possible agreement, the 2007 development plan itself is at most a statement of intent. See Schwanbeck, 412 Mass. at 706-707 ("[a] promise made with an understood intention that it is not to be legally binding, but

only expressive of a present intention, is not a contract" [citation omitted]).

Indeed, the references to "proposed" actions and "anticipated uses," and the use of the future tense throughout, suggest an intent to set forth preliminary terms that were to be finalized at a later date. Mendel Kern, Inc., 400 Mass. at 279 (statements in future tense of actions to be taken indicative of future contractual intent, not existence of current agreement). While a valid contract may be "contingent on future events," the contract must "provide mechanisms to narrow present uncertainties to rights and obligations." Lafayette Place Assocs. v. Boston Redev. Auth., 427 Mass. 509, 518 (1998), cert. denied, 525 U.S. 1177 (1999). Here, many aspects of the development are merely proposed and thus subject to change until approved by the BRA. Accordingly, it does not create a binding contract. Contrast id. (holding that agreement was enforceable, despite lack of firm purchase price, because agreement provided for pricing formula and "most of the information needed to complete that formula was available").

Nor can the 2007 agreement be enforced against Northeastern under the theory of promissory estoppel.[7] Promissory estoppel

---

[7] CPA also argues, for the first time on appeal, that the 2007 agreement can be enforced under the theory of judicial estoppel. By failing to raise this argument below, CPA has

requires "(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court, 448 Mass. 15, 27-28 (2006), quoting Bongaards v. Millen, 440 Mass. 10, 15 (2003). A promissory estoppel claim "is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration." Rhode Island Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 850 (1995). However, as discussed above, both the 2007 agreement and the 2007 development plan are statements of intent or agreements to negotiate, not unambiguous promises to develop property with CPA. See id. (rejecting promissory estoppel claim where evidence failed to support finding that "'promise' in the contractual sense had been made").[8] Nor does CPA point to facts in the record demonstrating

waived it. See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006).

[8] To the extent CPA seeks to base its theory of promissory estoppel on Northeastern's position as articulated in the 2013 litigation, it must also fail. The trial judge's decision in that case referenced Northeastern's position that CPA "has certain rights in connection with development of [subparcel 18-1A] and does not seek any order that would extinguish them." As discussed supra, the trial judge characterized the nature of CPA's rights as "not much better than a fishing license."

actions that it took in reliance on Northeastern's alleged promise to develop a hotel with CPA on subparcel 18-1A, or any detriment suffered as a result. Contrast Sullivan, 448 Mass. at 28-29 (plaintiffs stated claim for promissory estoppel where they alleged that they had refrained from suing defendant in reliance on defendant's promises to address safety concerns in office building).

    c. Count III -- breach of the implied covenant of good faith and fair dealing. We turn next to CPA's claim that Northeastern committed a breach of the implied covenant of good faith and fair dealing. "Every contract implies good faith and fair dealing between the parties to it" (citation omitted). Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991). However, the covenant does not create new rights and duties not already provided for in the contract. Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927 (2005) ("The scope of the covenant is only as broad as the contract that governs the particular relationship"). Accordingly, because the 1999 and

---

Acknowledging these rights in relation to subparcel 18-1A, without more, is not an unambiguous promise by Northeastern to develop a hotel on that parcel. Cf. Upton v. JWP Businessland, 425 Mass. 756, 760 (1997) (rejecting plaintiff's estoppel argument on basis that no enforceable promise existed, where plaintiff asked about regular work hours, and was so informed, but ultimately worked much later hours).

2007 agreements did not create any contractual obligation for Northeastern to involve CPA in the development of subparcel 18-1A, Northeastern's failure to do so cannot constitute a breach of the covenant of good faith and fair dealing.  Contrast Anthony's Pier Four, Inc., supra at 471-473 (refusal to approve changes to developer's plan constituted breach of implied covenant where developer had already spent years working on development and approval was unreasonably withheld in order to extract more favorable concessions).

    d.  Counts VII and VIII -- unfair or deceptive business practices in violation of G. L. c. 93A.  We turn to CPA's claims that Northeastern violated G. L. c. 93A by unilaterally petitioning the BPDA to develop subparcel 18-1A for its own use and repudiating CPA's rights in that subparcel.  General Laws c. 93A, § 2 (a), makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  To determine whether conduct rises to the level of an unfair act or practice, courts look to the following factors:  "(1) whether the conduct is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers or other businesses" (quotation and citation omitted).  H1 Lincoln, Inc. v. South Washington

St., LLC, 489 Mass. 1, 14 (2022). Business conduct "in disregard of known contractual arrangements" and aimed at securing benefits for the breaching party is an unfair act or practice under G. L. c. 93A. Anthony's Pier Four, Inc., 411 Mass. at 474, quoting Wang Lab., Inc. v. Business Incentives, Inc., 398 Mass. 854, 857 (1986). However, a mere refusal to deal, without more, is not an unfair trade practice. See PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975).

Viewed in the light most favorable to CPA, the facts show no conduct by Northeastern that rises to the level of an unfair or deceptive practice. The record before us only establishes that Northeastern refused to deal with CPA after multiple unsuccessful attempts to advance the hotel project. See PMP Assocs., Inc., 366 Mass. at 596. And contrary to CPA's contention, this case is markedly dissimilar to Anthony's Pier Four, Inc., 411 Mass. at 453 n.3, 467-468, where the underlying contract clearly required that the landowner work with the developer on the development of the property. Here, Northeastern had no contractual obligation to involve CPA and thus did not act unfairly or deceptively in repudiating CPA's claims. Nor did Northeastern use its refusal to deal to extract some sort of benefit from CPA. Contrast H1 Lincoln, Inc., 489 Mass. at 15 (unfair trade practice where defendant provided "pretextual and unreasonable grounds" for terminating lease and

then offered to reinstate lease to extract financial concessions from plaintiff); Anthony's Pier Four, Inc., supra at 473.

Lastly, we consider whether Northeastern's characterization of the 2013 litigation in its letter to the BPDA constitutes a deceptive business act or practice. As discussed supra in our discussion of the special motion to dismiss, Northeastern's characterization was essentially accurate, and not a misrepresentation constituting deception in violation of G. L. c. 93A. See generally Aspinall v. Philip Morris Cos., 442 Mass. 381, 394 (2004) (act or practice is deceptive if it possesses tendency to deceive). See also Nissan Autos. of Marlborough, Inc. v. Glick, 62 Mass. App. Ct. 302, 312 (2004) (lawyer's refusal to convey property under lease's purchase option was not "unfair or deceptive act" because "it was a prophylactic action taken in accordance with his earnestly held interpretation of the document and the law").

e. Count IV -- intentional interference with advantageous economic relationship. To succeed on a claim for intentional interference with advantageous relations, a plaintiff must prove that

> "(1) [it] had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."

Blackstone v. Cashman, 448 Mass. 255, 260 (2007).

The improper means or motive required to support a claim for intentional interference is "actual malice" or "a spiteful, malignant purpose, unrelated to the legitimate corporate interest" (citations omitted). King v. Driscoll, 418 Mass. 576, 587 (1994), S.C., 424 Mass. 1 (1996). "The motivation of personal gain, including financial gain, however, generally is not enough" to constitute improper motive. Id.

Here, the requirements are not satisfied. In particular, CPA has identified no improper motive or means as required by our case law. Viewed in the light most favorable to CPA, the record establishes only that Northeastern acted in its own corporate self-interest when it sought to develop subparcel 18-1A for its own institutional use after multiple unsuccessful attempts to advance the hotel project. This, without more, is not an improper means or motive. See King, 418 Mass. at 587. See also Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 62 Mass. App. Ct. 34, 39 (2004) (defendant's "legitimate advancement of its own economic interest" was not improper motive or means for purposes of tortious interference claim). Accordingly, CPA was not entitled to relief on this claim as a matter of law.

f.  Count V -- unjust enrichment.  CPA's claim for unjust enrichment similarly fails as a matter of law.  Unjust enrichment is the "retention of money or property of another against the fundamental principles of justice or equity and good conscience" (citation omitted).  Sacks v. Dissinger, 488 Mass. 780, 789 (2021).  A plaintiff must show that (1) he or she conferred a measurable benefit on the defendant, (2) he or she reasonably expected compensation from the defendant, and (3) the defendant accepted the benefit with knowledge of the plaintiff's reasonable expectation.  Stewart Title Guar. Co. v. Kelly, 97 Mass. App. Ct. 325, 335 (2020).

CPA's unjust enrichment claim fails because the record does not establish a monetary or property benefit that CPA conferred on Northeastern.  See Tedeschi-Freij v. Percy Law Group, P.C., 99 Mass. App. Ct. 772, 780 (2021) (attorney's unjust enrichment claim, based on law firm's continued use of her name after she had departed firm, failed as matter of law where record contained no evidence that firm derived quantifiable benefit from continued use of name).  Contrast Liss v. Studeny, 450 Mass. 473, 479 (2008) (lawyer's competent representation of client in course of lawsuit conferred "measurable benefit" to client, notwithstanding fact that lawsuit was ultimately unsuccessful).

g.  Counts IX and X -- declaratory and injunctive relief.
CPA's complaint also requested entry of a judgment declaring
that Northeastern must include CPA on any development of
subparcel 18-1A or otherwise compensate CPA for the value of
such development, as well as an injunction mandating that
Northeastern negotiate in good faith with CPA for payment of the
"fair and reasonable value" of CPA's alleged development rights
in subparcel 18-1A as a condition precedent to proceeding with
its development application before the BPDA.  Both counts fail
as a matter of law because CPA has no development rights for
which Northeastern must provide compensation.  See School Comm.
of Cambridge v. Superintendent of Sch. of Cambridge, 320 Mass.
516, 518 (1946) (declaratory judgment available if party
demonstrates it has "definite interest" in legal right denied by
another).  See also Woods v. Wells Fargo Bank, N.A., 733 F.3d
349, 353 n.3 (1st Cir. 2013) (noting that injunctive relief is
not stand-alone cause of action under Massachusetts law).

4.  Attorney's fees.  Finally, we address the issue of
attorney's fees in light of CPA's contention that Northeastern
should not have been awarded attorney's fees under G. L. c. 231,
§ 59H, because this is not a "SLAPP suit."  Where, as here, a
judge allows a special motion to dismiss a plaintiff's claim,
"[t]he judge has no discretion in deciding whether to award
costs and fees."  McLarnon v. Jokisch, 431 Mass. 343, 349–350

(2000). Such an award is mandatory under the statute. See G. L. c. 231, § 59H.

Because Northeastern was entitled to attorney's fees under the statute, and because CPA does not argue that the amount awarded was unreasonable, we do not consider the reasonableness of the award on appeal. See McLarnon, 431 Mass. at 349-350. In its brief, Northeastern has requested an award of appellate attorney's fees and costs as well. Because we affirm the ruling of the motion judge allowing the special motion to dismiss as to count VI, Northeastern is entitled to such an award. See Benoit v. Frederickson, 454 Mass. 148, 154 (2009). Accordingly, within fourteen days of issuance of the rescript in this matter, Northeastern may file a petition for reasonable appellate attorney's fees and costs in accordance with the procedure set forth in Fabre v. Walton, 441 Mass. 9, 10-11 (2004). See O'Gara v. St. Germain, 91 Mass. App. Ct. 490, 501 (2017).

5. Conclusion. We affirm the allowance of Northeastern's special motion to dismiss count VI of CPA's complaint. We also affirm the entry of partial summary judgment in favor of Northeastern on counts I, II, III, VII, and VIII, as well as the

allowance of Northeastern's motion to dismiss counts IV, V, VI, IX, and X.[9]

Judgment affirmed.

---

[9] Northeastern has moved to strike a letter that CPA filed after oral argument in this case.  Because our decision does not rest on the contents of CPA's letter, we need not consider the motion.  See Matter of the Discipline of an Attorney, 442 Mass. 660, 674 n.29 (2004).