NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1038

NICOLA VARANO

vs.

PDJM LAND TRUST, LLC, trustee,[1] & others.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Defendant PDJM, LLC (PDJM or lessor) timely appeals from a final judgment that (1) entered in favor of commercial tenant Nicola Varano (Varano or lessee) on Varano's complaint seeking declaratory relief from impending eviction and (2) dismissed PDJM's competing counterclaim seeking summary process termination of the tenancy and eviction.[3] On appeal, PDJM argues that Varano's chronic failures to timely pay rent, to address certain maintenance issues at the premises, and to respond to a letter from PDJM's insurance agent were "not insignificant" and

_____

[1] Of 417-419 Hanover Street Realty Trust.

[2] PDJM, LLC; and Filippo E. Frattaroli, individually and as manager of PDJM Land Trust, LLC, and PDJM, LLC.

[3] PDJM, LLC is the only defendant that has pursued an appeal. All other claims and counterclaims have been waived.

were in fact material breaches of the lease. PDJM further contends that given Varano's intentional and willful breaches of the lease, equity may not be invoked to protect Varano from forfeiture, and therefore, the lease's default clauses should be enforced. We affirm.

Background. We summarize the facts from the Superior Court judge's findings, reserving some facts for later discussion.

1. The parties and the operative lease provisions. An experienced restauranteur, Varano owns and operates a restaurant called Nico Ristorante (Nico) at 417 Hanover Street in the north end of Boston (property or premises). Nico has been operating at that location since 2008 and currently possesses the space pursuant to a lease, signed by Varano as lessee, that began on January 1, 2015. The lease has a ten-year term with an option to extend for another ten-year term, and was assigned to PDJM, as lessor, after PDJM purchased the property in late 2016. Filippo E. Frattaroli, the manager of PDJM, has owned and operated a restaurant called Ristorante Lucia next door to Nico for many years with his wife, Anna Frattaroli,[4] and their children.

_____

[4] Although Filippo and Anna share a last name, we shall refer to Anna Frattaroli hereinafter as Frattaroli, as none of our other statements in this decision pertain to Filippo. Anna manages PDJM's properties and serves as its point person for all communications with PDJM's tenants. Rosanna Scrivo, Nico's

2

The lease, as interpreted by the judge and not challenged on appeal, requires Varano to pay rent on or before the first day of the month for which rent is due. Among other remedial provisions for not so paying rent, the lease contains two default clauses, section 19 and section 1(m)(i) of Rider A, which outline the circumstances in which breach or breaches by the lessee will entitle the lessor to terminate the tenancy. The lease also contains a provision, section 25, that authorizes the lessor to assess a financial penalty against the lessee for untimely rent payments. Finally, the lease contains a number of provisions, including sections 11 and (1)(e) and 1(o) of Rider A, that detail Varano's obligations to (1) maintain the premises in good condition; (2) promptly, on receipt of written notice from the lessor concerning condition problems, take reasonable corrective action; and (3) fully comply "with all Applicable Laws," defined by the lease to include "any requirements of [PDJM's] insurance underwriters."

2. <u>The breaches alleged and the notice to quit</u>. On January 9, 2017, Frattaroli sent an e-mail message to Scrivo, notifying her that PDJM's accountant had not yet received Nico's January rent, which was "due on the first of the month." Frattaroli further stated, "[W]e are asking tenants to mail the

---

bookkeeper, is Varano's designated agent for all lease-related issues and is responsible for the day-to-day operations at Nico.

rent at least one week earlier than they had been doing."
Despite this request, Scrivo continued to pay the rent after the
first of the month for every month but one from December 2016,
when PDJM assumed the lease, through the date of the notice to
quit and termination of the lease (notice to quit) on August 15,
2018.  During that period, Frattaroli sent Scrivo no fewer than
fifteen separate written communications notifying her of Nico's
past due rent.  On most occasions, Scrivo remitted the overdue
rent promptly after receiving the notices.

In addition to the rent-payment issues, between mid 2017
and 2018, PDJM raised concerns about Varano's use and
maintenance of the restaurant premises.  On June 21, 2017, Peter
R. Nobile Insurance Agency, Inc. (Nobile) issued a notice to
Nico summarizing the results of a site inspection conducted by
PDJM's insurer, Vermont Mutual Insurance Company.  In the
letter, Nobile identified six premises-maintenance issues in
need of correction, including, as herein relevant, (1) the
disorderly storage of equipment and supplies in the basement and
the courtyard areas, and the improper storage of items too close
to boilers, water heaters, and electrical panels; and (2) an
unsealed vent opening in the chimney servicing the boilers and
water heaters.  Nobile cautioned that failure to address the
issues within a roughly one-month timeframe risked cancellation
of PDJM's insurance on the property.

4

In response to a more formal letter from PDJM's attorney threatening eviction and a "Final Letter" from Nobile demanding written confirmation of remediation, Scrivo sent an e-mail message to Nobile explaining that Nico had recently been the subject of a full site inspection by the city of Boston (city) inspectional services department (ISD) and attaching a copy of the certificate of inspection, which signified that the restaurant was compliant with the State's building code, among other codes. Notwithstanding Frattaroli's demand, conveyed by Nobile, that Scrivo address each of the issues identified by Nobile on an item-by-item basis and supply documentary proof that each had been rectified as required, no detailed response in the form demanded by Frattaroli was forthcoming.

On July 2, 2018, Walter Blair Adams, a code consultant expert hired by PDJM, conducted a private inspection of Nico. Adams documented ongoing compliance problems at Nico, including the disorderly and improper storage of items and supplies and the vent opening in the chimney that remained unsealed. On the day after the private inspection, PDJM's attorney hand delivered to Varano a notice of default for nonpayment of rent that assessed late charges and demanded payment of all arrearages. On August 15, 2018, PDJM's attorney served Varano with the notice to quit, invoking (1) Varano's prior default and continuing failure to pay timely rent on multiple occasions as

5

an automatic event of default arising under section 1(m)(i) of Rider A (from two or more late payments in 2018), and (2) the failure, despite notice, to make repairs. The notice informed Varano that his lease was terminated and that PDJM would initiate eviction proceedings if Nico did not vacate and surrender the premises by August 31, 2018. At the time, the rent was paid in full. Varano responded by filing this action.

3. The judge's decision. Following the trial, the judge issued a comprehensive fifty-page decision in favor of Varano on his declaratory judgment count and on PDJM's counterclaim for possession. The judge first found that Varano committed three breaches of the lease: (1) the "persistent" failure to pay timely rent; (2) the chronic, disorderly and improper storage of supplies and other items in the basement and the courtyard areas; and (3) the failure in a timely fashion to seal the vent opening in the chimney.[5] Next, applying both the traditional test of materiality under Massachusetts contract law, see G4S Tech. LLC v. Massachusetts Tech. Park Corp., 479 Mass. 721, 732-734 (2018), and cases cited, as well as the more detailed factors bearing on the issue relied on by this court in DiBella v.

_____

[5] The judge concluded that the other use and maintenance problems cited in the notice to quit to justify eviction were either nonexistent or addressed in a reasonable time by Varano, and thus, did not constitute actionable lease violations. PDJM has not challenged that determination on appeal.

6

Fiumara, 63 Mass. App. Ct. 640, 646-647 & n.7 (2005), the judge determined that the breaches were "neither material nor sufficiently significant and substantial to warrant enforcement of the [lease]'s [d]efault clauses."  The judge rejected PDJM's contention that as a matter of Massachusetts law the persistent late payment of rent constituted a material breach of a commercial lease.  Finally, the judge provided a second basis for his decision, ruling that even if Varano had committed more breaches than found and those breaches could be deemed "sufficiently significant and non-trivial to allow for enforcement of the [l]ease's [d]efault clauses," he would grant equitable relief to Varano to avoid working a "seriously unfair forfeiture."  See Nautican Realty Co. v. Nantucket Shipyard, Inc., 28 Mass. App. Ct. 902, 904 (1989) ("equity does not favor forfeiture of leases").

Discussion.  1.  The standards of review.  In reviewing the decision of a judge following a bench trial, "we accept [the judge's] findings of fact as true unless they are clearly erroneous, but we scrutinize without deference the legal standard which the judge applied to the facts."  Wells Fargo Bank, N.A. v. Sutton, 103 Mass. App. Ct. 148, 154-155 (2023), quoting Cambridge St. Realty, LLC v. Stewart, 481 Mass. 121, 123 (2018).  See Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996).  "A trial judge's finding is clearly erroneous only

7

when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted).  H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13 (2022).  "We examine the judge's imposition of equitable remedies under an abuse of discretion standard." Demoulas v. Demoulas, 428 Mass. 555, 589 (1998).

2.  The untimely payment of rent.  PDJM argues that the judge erred in finding that Varano's habitual late payment of rent in breach of the lease was immaterial and not "sufficiently significant and substantial" to justify the termination of the lease.  While we agree with PDJM that the chronic late payment of rent was not "insignificant," any error by the judge was inconsequential since we conclude the judge did not err by finding that Varano's actions did not amount to a material breach, and further, that equity strongly disfavored forfeiture.[6]

---

[6] There is some uncertainty whether the judge concluded that the late rent payments were "insignificant" or "not insignificant" breaches of the lease (i.e., the midlevel type of breach discussed in DiBella, 63 Mass. App. Ct. at 644-645).  Although the judge did not explicitly categorize the breaches for late payment as "insignificant," the parties inferred that he concluded as much from his decision.  Even if the judge concluded that one or more of Varano's breaches were "insignificant and trivial," nothing turns on that fact.  The result would be the same, as insignificant breaches could never lead to lease termination, see id. at 644 (if breach is insignificant, courts will not permit termination even if, as here, there is default clause in lease), and the judge elected to use his broad equitable powers to preserve the tenancy.

See DiBella, 63 Mass. App. Ct. at 648-649 (tenant's demolition of shed in violation of "important" alteration clause not material but also "not trivial or insignificant"; default clauses do not always control where "strong equitable considerations" are present).

"A breach of a contract is a material breach when it involves 'an essential and inducing feature of the contract.'" EventMonitor, Inc. v. Leness, 473 Mass. 540, 546 (2016), quoting Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 470 (1991). "Essential and inducing features of a contract are provisions that are 'so serious and so intimately connected with the substance of the contract[ ]' that a failure to uphold the provision would justify the other party walking away from the contract and no longer being bound by it." G4S Tech. LLC, 479 Mass. at 734, quoting Bucholz v. Green Bros., 272 Mass. 49, 52 (1930), S.C., 290 Mass. 350 (1935). See id. (failure to make monthly payments to painter as agreed was material breach because payments were "essential and inducing feature" of contract); Lease-It, Inc. v. Massachusetts Port Auth., 33 Mass. App. Ct. 391, 396 (1992) (plaintiff's intentional nonpayment of monthly concession and rental fees was material breach of agreement); Aerostatic Eng'g Corp. v. Szczawinski, 1 Mass. App. Ct. 141, 145 (1973) (defendant's failure to pay large part of sum owed was "substantial breach going to the root of the

contract thus entitling the plaintiff to terminate").  The question whether a party has committed a material breach ordinarily is one of fact for the fact finder.  See EventMonitor, Inc., supra.

Here, the judge's ultimate finding that Varano's late payments were not material breaches was amply supported by his subsidiary findings and not clearly erroneous.  Applying the first DiBella factor and the similar common-law test of materiality, the judge concluded that PDJM had "in no meaningful sense been deprived of an 'essential and inducing feature' of its contract with Varano."  See DiBella, 63 Mass. App. Ct. at 646-647 & n.7.  As the judge reasonably found, consistent with the testimony of Joseph Bisognano, III, and Varano, the "core bargain struck between the parties . . . was for a restaurant tenant to occupy commercial space . . . [in exchange for] a stipulated monthly rent over an extended period of years" –- and not for the lessor to receive such rents by a particular date.[7]

---

[7] PDJM was not involved in the negotiation of the operative lease at its inception.  Bisognano, principal of NE 417 LLC, the company that negotiated the operative lease with Varano and sold the property to PDJM, testified that, while he read the lease to require that rent be paid on or before the first of each month, the prevailing practice in commercial real estate circles is to allow for a thirty-day grace period before treating a late-paying tenant as being in default.  Bisognano further testified that he gave Varano a thirty-day grace period in which to make his rent payments.  Varano and Scrivo testified that they had an understanding with their previous two landlords that the monthly

10

PDJM received all rent payments to which it was entitled under the lease; and though late, Varano's payments were never more than a matter of weeks late, and most often they were only days late.  Thus, Varano's breaches did not deprive PDJM of the principal benefit of its bargain.  At bottom, the degree of breach by Varano is fundamentally different than the complete nonpayment of wages or large amounts due under contracts involved in cases for which contract termination was permitted.[8]  See, e.g., Bucholz, 272 Mass. at 52; Aerostatic Eng'g Corp., 1 Mass. App. Ct. at 144-145.

Moreover, PDJM, a "substantial real estate concern," did not show that it was harmed by the untimely rent payments.  On this point, the judge found that PDJM's abilities to make its mortgage payments to its lenders and "to otherwise conduct its financial affairs in a business-like manner" were not impaired.

rent could be paid at any time during the month for which the rent was due.

[8] PDJM contends that the "artificial" distinction between failing to pay rent and failing to timely pay rent is one without meaning, but we disagree.  Here, the "essential and inducing feature" of the lease for PDJM was the receipt of monthly rent over a period of ten years, and PDJM received all rent to which it was entitled for the period in question.  Additionally, the rent delays were mostly modest and the judge found that they never caused PDJM to fall behind on its own financial obligations.  Had Varano failed altogether to pay rent, PDJM's ability to receive the principal benefit of the bargain and to meet its financial obligations would look meaningfully different.

To the extent that PDJM takes issue with the judge's rejection of Frattaroli's testimony about PDJM's alleged need of Varano's rent to pay the mortgage and other expenses, the judge was in "the best position to judge the weight and credibility of the evidence" (citation omitted). Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 510 (1997).

The judge also found that all four remaining DiBella factors weighed in Varano's favor and against a finding of materiality and significance. First, through the lease's late charge provision, PDJM can "adequately compensate[]" itself for the part of the benefit of which it may have been deprived by Varano.[9] Second, if Varano's tenancy were terminated, he would suffer a "severe" forfeiture that is disproportionate to his lease violations. Not only would Varano lose approximately $500,000 in premises improvements he made, a substantial sum for a small establishment like Nico, but he would also likely be

_____

[9] As the judge noted, "the only discernible loss suffered by PDJM on account of Varano's tardy rent remittances is the time-value of money." As noted above, section 25 of the lease authorizes PDJM, after a ten-day grace period, to assess a "stiff" late charge of one and one-half percent of the amount of rent due for each month or portion thereof during which the rent remains unpaid. As the judge found, many of Varano's late payments fell within the ten-day grace period, and most others were untimely "by so few days as to make the assessment of late charges trivial and evidently not worth the bother." PDJM availed itself of this remedy only once during the twenty-one month period between PDJM's assumption of the lease and issuance of the notice to quit. From PDJM's single assessment of late fees, the judge inferred that the rent delays were "insignificant."

forced to relocate outside of the north end. As the judge further found, "summary eviction of Nico from its prime location on Hanover Street would erode the branding and diner good will it has developed over the course of its 14-year history at this venue . . . [and] could well put this restaurant out of business altogether." Thus, the potential impact of such a forfeiture threatened Nico's very existence, far exceeded the gravity of Varano's lease violations, and "militat[ed] strongly against treating such breaches as sufficiently significant to justify eviction." Contrast DiBella, 63 Mass. App. Ct. at 648 (judge's finding that benefit lost by landlord was "vastly disproportionate" to proposed forfeiture was not clearly erroneous). As for the third DiBella factor, the likelihood that Varano will cure his performance failures, the judge found that "the scale tilts slightly in favor of Varano and against PDJM." Although disorderly storage and late rent payments were "recurring" practices and there was evidence that Varano continued to make late payments intermittently even after the notice to quit, at the time of trial, the judge was unaware of any lease violations that required a cure.[10] Finally, nothing in

---

[10] Following the trial, PDJM now has an additional remedy at its disposal for late rent payments: the ability to ask a court to hold Varano in contempt for violating the trial judge's order to pay the rent on or before the first of the month for which rent is due. Varano offered to subject himself to contempt for any future violations.

13

Varano's behavior "fail[ed] to comport with standards of good faith and fair dealing." PDJM has not challenged, let alone shown, that any of these findings is clearly erroneous.

We disagree with PDJM's contention that chronic late payment of rent is necessarily a material breach of the lease under Massachusetts law. While the persistent late payment of rent by a tenant could amount to a material breach of a lease even after factoring in equitable considerations, in the circumstances of this case, the judge was not required to find a material breach by Varano.

3. The alleged failure to respond to the Nobile letter and to correct code violations. On appeal, PDJM argues that the judge erred by concluding that Varano's intentional failure to respond to the Nobile letter and his "indisputabl[e]" failure to correct the "substantial" code violations were insignificant and trivial breaches of the lease. This argument fails for the reason, if no other, that it mischaracterizes the judge's findings.

Here, the judge found that Varano's "occasional premises maintenance lapses" were not "willful" or "purposeful in intent," but rather "transitory, [and] rectified promptly in whole or substantial part . . . when brought to [Varano's] attention"; that Scrivo believed all six items referenced in the Nobile letter were rectified, at least to the greatest extent

14

circumstances allowed; and that Varano reasonably responded to the compliance issues raised in the Nobile letter. The judge further found that "these [premises-related] transgressions visited no adverse operational consequences, and imposed no economic burdens, on PDJM. Nico was never cited by a government authority for a code infraction; never failed to pass ISD inspection; and was never forced to close or suspend operations for any reason." Indeed, addressing Varano's overall maintenance of the premises and PDJM's claim that Varano deserved to be evicted for his "lapses," the judge found "striking" that the evidence established only a handful of claimed violations. These findings were all well supported.

As PDJM's own expert acknowledged, given the hundreds of compliance requirements to which restaurants are subject, "periodic code infractions of the type exhibited by Nico are to be expected" and "[a]t any given moment, virtually all restaurants will transgress applicable requirements of a building code, and Nico was no exception." See Kaplan v. Flynn, 255 Mass. 127, 130 (1926) (lease covenant to keep premises in good repair must be assessed "with reference to the use the premises were to be put to and the business to be carried on").

15

Finally, we note PDJM never lost its insurance because of any premises maintenance issues.[11]

Moreover, contrary to PDJM's assertion, Varano did in fact respond to Nobile. In response to Nobile's second, "Final Request" letter, Scrivo sent an e-mail message to Nobile, informing it that Nico had recently passed a full ISD inspection and attaching a copy of a recent certificate of inspection.[12] Nobile seemed satisfied with Scrivo's response, and PDJM does not explain how Varano's failure to respond in the precise format requested by Nobile violated any provisions of the lease. Thus, we fail to see any breach, let alone a material one.

4. The anti-forfeiture doctrine. We discern no abuse of discretion in the judge's exercise of his equitable powers as an independent ground to support his ruling in favor of Varano and against PDJM on its counterclaim for eviction. See Demoulas, 428 Mass. at 589. On appeal, PDJM argues that Varano was not entitled to relief under the "anti-forfeiture doctrine" due to his intentional, willful, and "bad faith" breaches of the lease.

_____

[11] To the extent that PDJM argues that the judge erred by requiring it to show actual harm from the premises-maintenance violations, the question whether a lessor will suffer loss is a relevant factor in assessing the materiality of the lease violations and the appropriateness of forfeiture. See DiBella, 63 Mass. App. Ct. at 646 n.7, and authorities cited.

[12] As PDJM's expert conceded, "an ISD [c]ertificate ordinarily attests to a restaurant's compliance with all city requirements in the areas of fire safety, health and cleanliness."

Like the previous argument, this argument is unavailing because it is based on a view of the evidence the judge did not take.

In any event, even if the judge had found that Varano committed willful violations, which he did not, a finding that a tenant violated the lease by willfully and intentionally failing to pay rent would not preclude equitable relief. See Howard D. Johnson Co. v. Madigan, 361 Mass. 454, 456-457 (1972), quoting Eno Sys., Inc. v. Eno, 311 Mass. 334, 338 (1942) ("Relief against forfeiture has been granted although a lessee has failed to pay rent at the times and in the manner designated by the

lease and even if such failure has been wilful and intentional").[13],[14]

Judgment affirmed.

By the Court (Milkey, Walsh & Smyth, JJ.[15]),

Assistant Clerk

Entered: March 18, 2024.

---

[13] To the extent that PDJM argues that Varano is unable to take advantage of this rule in equity in light of his failure to make PDJM whole by paying interest, late charges, and attorney's fees, see Gordon v. Richardson, 185 Mass. 492, 492 (1904), it did not raise this argument in the trial court and in fact raises it for the first time in its reply brief. The argument is thus not properly before us, and we do not address it. See Katz, Nannis & Solomon, P.C. v. Levine, 473 Mass. 784, 795 n.15 (2016).

[14] Varano's request for costs in connection with this appeal is denied.

[15] The panelists are listed in order of seniority.